**GREAT LAKES DREDGE & DOCK CO. v. METROPOLITAN SAND & GRAVEL CORPORATION et al.**

**METROPOLITAN SAND & GRAVEL COR-PORATION v. THE GEO. H. JACKSON et al.**

**THE GEO. H. JACKSON.**

**THE METROPOLITAN NO. 3.**

**THE G–G NO. 202.**

**THE G–G NO. 32.**

Nos. A–17734, A–18272.

United States District Court
E. D. New York.

Feb. 15, 1949.

Kirlin, Campbell, Hickox & Keating, of New York City (John F. Gerity and Edward C. Biele, both of New York City, of counsel), for Great Lakes Dredge & Dock Co.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for Metropolitan Sand & Gravel Corporation.

BYERS, District Judge.

The steamtug Geo. H. Jackson capsized and sank in the waters of Newark Bay on October 30, 1945, at about 1:45 A.M., E.W.T., while engaged in assisting, or as the result of making an effort to assist, a Metropolitan tow to make its way into the channel running northeasterly from Shooters Island to the upper reaches of the Bay.

These two causes, which were consolidated for trial, present the conflicting claims of the respective owners of the craft involved; in the first, recovery is sought for damages to the tug, for loss of the crew's effects, and for salvage services said to have been rendered to the tow; in the second, the aim is to recover for damages sustained by the second scow in the tow as the result of contact between her and the tug

Jackson, as she was turning over and settling in her sunken position.

The only matters in dispute concern the maneuvers of the tow, and the manner in which the tug was handled. As to both, there is no expert opinion evidence, and the Court is left to reach its own untutored conclusions as to how the operation should have been conducted if the skill of their calling had been brought to bear by the captains of both tugs.

The area involved is indicated on the Chart; Ex. 1, as embraced between the Central Railroad of New Jersey on the north, and the northerly line of the channel of the Kill Van Kull as it runs generally east and west, on the south. That dimension is about 4,050 feet.

The channel with which these causes are concerned is about 590 feet wide (apparently 500 feet is the minimum width) and makes under the railroad bridge, which is supported by an abutment so placed that the dredged portion is wider on the westerly or port side of an ascending tow, than on the starboard hand; and yet the depth on that side, below, directly under, and for at least 1,000 feet above the bridge to a width of about 600 feet outside the channel to the easterly, is shown to be as much as 24 feet. In view of that circumstance, it is difficult to accept the version of the Metropolitan tug's captain, that the westerly channel is to be preferred and is customarily used by tows. If there is justification for ignoring Article 25 of the Inland Rules, 33 U.S.C.A. § 210, the evidence to that effect is lacking.

Perhaps this statement is not of much import except as the course chosen by the Metropolitan tow in entering the channel as it did from the east, and the immediate maneuvers consequent upon that movement, tend to illuminate what happened.

There had been dredging operations carried on in these waters from at least October 16, 1945, as navigators were notified by the Coast Guard by notice of that day, and as the captain of the Metropolitan No. 3 knew from observations made on October 26th, when he hauled a tow through this channel.

The affected area of the dredging operations is shown on the Engineers Map (Ex.

4) which embraced much of the channel below the bridge and an extended area adjacent to the Kill which constituted roughly a triangle having the northerly line of the Kill as its base nearly 2,000 feet long, with a westerly side of nearly 1,500 feet, and an easterly side of better than 1,000 feet.

The dredging equipment and the respective positions of the elements thereof are not in dispute: The dredge Crest was held by 3 spuds about 12 feet west of the center line of the channel, not more than 200 feet above the base of the triangle.

The dredge Majestic outside the westerly line of the channel, but just within the dredged area and near the base of the triangle. Her presence played no part in these events.

The dredge Toledo, also held by 3 spuds, about 80 feet east of the westerly line of the channel, and about 900 feet southerly from the railroad bridge. Her position is stated to have been the cause of the navigation of the Metropolitan tow. The Toledo is a steel dipper dredge (150 feet by 55 feet by 11.6 feet) without power for propulsion. Since the channel where the Toledo lay was not less than 500 feet wide, her position meant that the westerly half thereof was reduced by 135 feet, so that to her port hand (she was headed down stream) there was at least 365 feet of open water measured from her port side to the easterly edge of the channel.

Since the dredging operations involved the removal of dredged material in barges, these were towed from alongside the dredges by the tug Jackson and hung up at a stake boat, where they were made up into tows and taken to sea.

That stake boat was the GL.17, a steel dump scow (167.5 feet by 43 feet by 14.7 feet) held at anchor by a single chain swivelled to two anchors. Her position is important but not controlling. Manifestly she had to be out of the channel, and yet in waters of sufficient depth to enable her to function. The Metropolitan testimony is that she lay about 300 feet off (to the west) of the channel, which is perhaps sufficient for present purposes, although the Jackson's captain (Merrill) says it was 500 feet. He was better informed and his estimate is preferred. She was abreast of a point not less than 1,800 feet southerly from the Toledo, measured along the westerly side of the channel.

Her position, as testified to by Merrill, shows a depth of 23 feet shoaling to 19 feet at Buoy C-3. She was headed southerly toward the Kill, in the flood tide, and 4 loaded scows were hung to her (the safe limit in number), each of sufficient size to carry 3,000 tons of dredged material.

The incidents about to be related were not influenced by the presence of any other vessels in the vicinity, or by wind, or lack of visibility, as the night was clear but dark. All vessels here involved carried lights as required, which were burning. The tide was running flood at a strength of 2 knots, and it played a decisive role in what took place.

It is undisputed that the set of the tide, from the southerly entrance to this channel as it moved from the Kill, was northwesterly toward Buoy C-3, that is, in the direction of the shoal waters (6 to 9 feet) to the immediate west of the channel and extending northerly from Buoy C-3 to and beyond the bridge. From that Buoy, the set is northerly and then northeasterly to the bridge, which is the direction of the flow of the channel.

The Metropolitan tow consisted of the wooden diesel tug Metropolitan No. 3 (63 feet overall by 17.4 feet by 8.2 feet inside depth; h. p. 240) and 2 companion loaded sand scows in tandem at the end of 120 feet of towing hawsers made fast to the outside corners of the head scow (G-G No. 32). The scow astern, separated by from 2 to 4 feet of lines, was the G-G No. 202. Their dimensions were 112 feet by 33.1 feet, height of sides 10 feet, and since they were each carrying 700 tons of sand, the freeboard midships was from 12 to 18 inches. Thus the tow measured not less than 410 feet overall.

As the tow approached from the easterly reach of the Kill, the lights on the Majestic and the Crest were observed, and Lusby, the captain of the Metropolitan No. 3, decided to turn into this channel by coming around the Crest and passing her to starboard by about 150 feet, which put him at

once in the westerly side of the channel. This can scarcely be criticised since there was no descending navigation to reckon with, and the swing of his tow, had he elected to enter the easterly side, might have caused his scows to strike the Crest under the impetus of the set of the tide which has been explained.

As it was, the scows did swing wide, and as the tow moved northerly they were to port and of course astern of their tug, so that the tow as a whole was not in shape to proceed in a straight course up the channel, nor did it become so until just prior to clearing the Toledo, which later it did, passing under the bridge on the easterly side and hanging up there for reasons to be stated.

The tow was being swept in a northerly direction in the diagonal shape described, and for lack of power to cross to the easterly side, it drifted toward the stake boat. This is deduced from Lusby's testimony that the tow could move at one mile an hour, and with a 2-mile tide could make 3 miles over the ground; that he did not have the time or power to move his tow across the channel to the easterly side, so as safely to pass the Toledo which was about three-eighths of a mile beyond where he soon found himself; and his statement that he had decided in his own mind to try to hang up at the stake boat, rather than continue.

He came to this view because he felt that the Toledo blocked his way in the westerly part of the channel, and this was a surprise since he had last observed her (October 26th) working in the easterly half.

He said his original intention was to so proceed as to pass under the westerly bridge opening, as that was the customary course to follow. As to this latter statement, as has been said, I do not think there is evidence to support it, nor that it is plausible on its face.

In any case, the tow was observed by Merrill, the captain of the Jackson (who was about to take two of the loaded scows at the stake boat to sea) when it was about 400 feet off, and drifting in a northwesterly direction. Whether the Metropolitan

No. 3 herself was out of the westerly channel is not easy to determine from the evidence, but certainly the scows were. (Merrill says the tow was 200 feet west of the channel, which could mean that the diesel tug was included in that observation.) Remembering that this episode occurred at night, without warning, and that those who testified as to what they saw were engaged in other tasks immediately prior to the appearance of the tow, it is no cause for wonder that the record is lacking in precise and dependable observations.

The question of the tow's position at this time is important as the fifth, sixth and seventh specifications of fault, attributed to her in the libel in the first cause, are directed to this subject.

Without more, I should suppose that fault could not be predicated of the position itself. The duty which the tow owed to other vessels in the vicinity was not to endanger them, and if it had been possible for the tow to maneuver itself back into the channel, and she had done so, no cause could have been laid, based only upon the out of channel position.

However, by allowing that to take place, the tow assumed a clear responsibility so to order its further movements as not to visit peril upon any other vessel within the area involved in maneuvers consequent upon the necessities so created.

Lusby's decision to pull over to the stake boat, and hang on, has been referred to; apparently this was as he "proceeded by the dredge Crest" but how far along does not appear. Nor is it perceived that the decision could have been carried into effect, since he would have had to round to above the stake boat and buck the tide so as to come into position to accomplish the purpose.

Having in mind the length of the tow, the shoal waters above Buoy C-3 and the lack of power to cross the tide, it is not apparent how the Metropolitan No. 3 could have made good such a movement, or indeed how her captain could have believed it possible. So much of his testimony is unconvincing.

Merrill for the Jackson says that he perceived the danger that the drifting tow

would hit the Toledo. This observation tends to put the tow fairly to the westerly channel line, for otherwise the tide would not sweep her clear of the shoal water in the vicinity of Buoy C-3.

Then ensued a conversation between the two captains, the upshot of which was that the Jackson would assist the tow to get into the channel. No one heard Lusby ask to hang up at the stake boat, and as 4 laden scows were already made fast to her, it is apparent to me that no such request was made and declined, but the purpose of the Jackson to assist as stated was mutually accepted as the requirement of the moment; also that Lusby said in effect that he did not have sufficient power to bring his tow out into the channel.

The manner in which the Jackson functioned is the important question in the cases. She went alongside to port of the first scow and put a line on the midship bitt, and then went ahead at half speed under a left wheel.

If the shape of the tow at that moment of time could be clearly stated, it would be possible to offer a conjecture as to whether the action taken was calculated to accomplish the desired purpose in a seaman-like manner.

Taking the testimony of one of the Jackson's deckhands—Comer—who confuses the shape of the tow, and that of the other—Balegno—who was more experienced, and the apparent probabilities of the situation, the belief is induced that the tow was headed somewhat to the northeast, and that the scows were not in line but were tailing to port, but not perhaps as much as they had been directly after rounding the Crest; that the heading had to be altered somewhat toward the east, and that Merrill thought that by exerting a pull toward the stern end of the first scow to port, he would assist in enabling the entire tow to get over toward the easterly side of the channel. He said that this maneuver would tend to kink the tow so that the turn could be made, and perhaps this is true. It would require a better understanding than this Court possesses to conclude otherwise.

It seems that promptly thereafter the tow went sharply to her right; at least that is

the Jackson's criticism, according to Specification 8, with the result that the full effect of the tide, striking the starboard side of the scows, swept the Jackson broadside into shoal water, tipped her, and caused her to turn over on her port side and sink.

That is what happened, but whether the result is to be attributed to the Jackson, or to the Metropolitan No. 3, is the question for decision.

Just before the sinking, and after an estimated interval of 3 or 4 minutes, the Jackson cast loose the line from the midship bitt of the first scow, because Merrill decided to place it in the middle of the tow, either on the stern bitt of the first scow, or the bow bitt of the second. He says the tow had moved what he guesses to be 1,000 feet at that time, but that, because of her erratic change of heading due to unequal strain on the hawsers, he decided to rig a tow line in the middle of the tow, with head and stern lines, and himself pull the tow safely past the Toledo. In fact, that change was never effected, as the first line was shifted to the stern bitts of the first tow, but never made fast on the Jackson, and the sinking intervened as stated.

The narrative for the Metropolitan No. 3 is not helpful. Her captain, Lusby, seems to have assumed that he could proceed without reference to the Jackson, the movements of which he never observed. He learned of her sinking only after he had passed the Toledo, and was about at the bridge, where he then made fast as stated, at the abutment on the easterly side.

While he said that he was never aware that the Jackson helped his tow, it seems that this could not be the fact. It is contradicted by his own misgivings that he could handle his own tow as it was drifting toward the stake boat, or he would have pulled away without toying with the idea of hanging up his tow. It must be that, however ineptly she functioned, the Jackson did assist at the critical time, in holding off the tow from drifting in a northerly direction, and in assisting it to gain the easterly channel, whereby a safe passage by the Toledo was accomplished.

That the Jackson initially should have put out a stern line to the bow bitts of the

first tow, and have proceeded to pull the tow clear in that way, seems to be a convincing statement as Lusby makes it; just why that was not done has not been demonstrated. Perhaps the time was too short for making the wisest decision, but in any case a helping hand was rendered, and the service was believed to have been necessary, in the judgment of those who were closest at hand.

The 9th Specification of fault charges negligent maneuvering of the Metropolitan No. 3 (after the Jackson was engaged in her task of assistance), in that the tow was permitted to sweep the tug into shallow water, thus causing her to ground and capsize. The narratives relied upon are scarcely convincing, since they were the recitals of Merrill and the two deck hands.

Preoccupation with their own tasks, the inherent difficulties of making dependable observations at night, and the inability to see helm movements, combine to explain this Court's misgivings.

The obvious effort of the Jackson was to so turn the tow's heading as to avoid a striking of the Toledo. That was the reason for what the Jackson did, and it seems incongruous to argue that, because the heading *was* changed, more abruptly perhaps than was anticipated, that fault should be laid upon the Metropolitan No. 3. In other words, because success attended the effort at once instead of a little later, the tug and tow should be held.

Doubtless the tow's course was a wavering one to some extent, and perhaps there was so abrupt a change in her helm (4 points to starboard) as the Jackson's witnesses profess to have observed. They are somewhat fortified by the answer to an interrogatory of the first libellant, read into the record, and I should suppose that there must have been a starboard turn from the northeasterly heading, since Lusby says he altered his helm to head for the Texaco docks (D on Ex. 1, almost opposite the grounded position of the Jackson), but whether it was as much as 4 points, and whether it was gradual instead of abrupt, is not so clear. At least, I cannot condemn the Metropolitan No. 3 for turning somewhat to starboard since that was required, and it is not convincingly shown that she did so too precipitately. Also it is probable that she did not have both hawsers taut at the same time as she was working out into the channel; the force of the tide, and the lateral power exerted by the Jackson would combine to frustrate equal pressure on the two hawsers.

Also it is probable that the somewhat broadside movement of the tow was inevitable, and could have forced the Jackson aground. There is no other explanation of that development. It seems, however, that she chose to function in a position which was exposed to such a hazard, and cannot now be heard to say that the consequence should be visited upon the Metropolitan tow in the sense that fault is chargeable to it.

Attention is called to the effect of the abrupt change in the tow's heading as claimed, in that this caused the Jackson to let go the line she first put out, go back upon her engines, head her bow against the port side of the tow to hold her off, and then to drop back as stated. This but emphasizes the hazard of the position originally selected by the Jackson, from which to render the desired assistance. That selection was entirely hers, and she must accept its results, so far as charging fault is concerned, in the subsequent movements of the tow.

It is urged that the Metropolitan No. 3 was inadequate and not sufficiently powerful to keep her tow in line, and several long tow cases are cited in that connection. Much could be said about her failure to keep close enough to the Crest when the tow rounded into the channel. Her lack of sufficient power explains her having been out of her course when she was drifting to the stake boat. That was a condition, but not the cause of the grounding of the Jackson, as it has been the effort to explain. Moreover the Metropolitan's lack of power was known to Merrill, for Lusby explained it to him; with that knowledge Merrill made his choice concerning the method of assisting the tow. The subsequent course of the latter was in part contributed to by the Jackson, and I

am unable to separate the Jackson's part in the wavering course (so far as it was that) of the tow across the channel, from that supplied by the Metropolitan No. 3. A more powerful tug would not have put its tow in the vicinity of the stake boat in the first place, and criticism is justified in that connection; but to go further and find actionable fault as a result of that condition alone, is not presently seen to be required.

It results from the foregoing that the libellant's cause in damage is deemed not to be sustained by the proof; but that it has made out a claim in the nature of salvage for helping to assist the Metropolitan tow from a situation of peril, namely, that it was in a position from which it could not extricate itself and which was calculated to result either in stranding in shoal waters above Buoy C-3, or in being swept along the westerly edge of the channel and into collision with the Toledo.

The offer of assistance was accepted, and the effort was successful in that the tow was assisted into the channel and assumed such a shape that it was enabled to safely proceed, well clear of the Toledo, and toward its destination.

As performed, this was a short towing operation, lasting but a few minutes, and involved no conditions of peril to life or safety, if properly conducted.

The salved values are stipulated at $49,561.00; it scarcely seems that a portion thereof should be awarded in excess of 1½%, namely, $743.41, to be shared equally between the owner and crew; the distribution to the master and the crew to be pro rata according to the wage scale.

The damage to the Jackson is not thought to constitute an allowable item, Huasteca Petroleum Co. v. United States, 2 Cir., 27 F.2d 734, 735. In that case it is said: "It is clear that damage sustained by the salving vessel without negligence on her part is a proper element to be considered in determining the award to be given her."

As has been stated, the Jackson chose to render assistance in a manner and in a position that put her in peril. Of course she did not expect to be rolled over by the action of the tow, but she was initially free to choose where she would go to put a line on the head scow, whether to assist from a position ahead, or alongside, and the choice she made seems not to have been the one which would have been dictated by good seamanship. It would scarcely be reasonable to hold that she could not recover her damage in her first cause as pleaded, and then award the same amount under the guise of salvage.

The second cause is based upon the Jackson's alleged faults in wantonly and negligently making fast to the tow; in negligently navigating, when so made fast, with reckless disregard "for channels, etc.", and in causing the tug to come into heavy and violent collision with the tow, causing damage to the second scow.

Since there was no evidence produced in behalf of the second libel, it must be dismissed, for failure of proof.

There is no doubt that the second scow struck the Jackson and caused her to heel over so far that she sank, but that the Jackson caused this to happen by reason of her position on the port side of the tow, by no means follows. She unsuccessfully tried to push the tow after having let go the first line, as has been stated, and was actually trying to maneuver out of harm's way, when she was struck by the second scow. The allegation that the Jackson made fast to the tow "without permission and contrary to the express orders given by the Metropolitan No. 3" was proved to be untrue by the uncontested testimony to the contrary.

In the first cause, the libellant may take a decree for services in the nature of salvage, to the extent of $743.41, with costs; otherwise the libel is dismissed.

In the second cause, the libel is dismissed, without costs.

Settle decree. Findings are filed herewith.