**CHOTIN TRANSPORTATION, INC., Plaintiff-Appellant, Cross-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellee, Cross-Appellant.**

Nos. 84–5652, 85–5138.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 29, 1985.

Decided Feb. 19, 1986.

Frank S. Thackston, Jr. (argued), Lake, Tindall, Hunger & Thackston, Greenville, Miss., C.W. Walker, III, for plaintiff-appellant, cross-appellee.

Robert V. Smyth, II, U.S. Army, Nashville Dist. Corps of Engineers, Nashville, Tenn., Thomas L. Jones (argued), U.S. Dept. of Justice, Civ. Div., Torts Branch, Washington, D.C., for defendant-appellee, cross-appellant.

Before KEITH and KRUPANSKY, Circuit Judges, and EDWARDS, Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.

This is an admiralty case. These appeals are brought by both parties named above in a dispute over damages to Barge 3390 owned by Chotin Transportation, Inc. (henceforth Chotin) and damages to the upstream gates of the Wilson Lock on the Tennessee River owned and operated by the United States. The accident occurred in the nighttime on January 20, 1982—a rainy and foggy night.

Chotin 3390 was the lead unit of a barge train consisting of Chotin's tug M/V Francis R. Keegan and its two barges Numbers 3390 and 1794. The facts as found by the District Judge indicate that all parties concerned had to be aware of the heightened problems of navigating the lock imposed by rain and fog and the 13½ foot total clearance available after this 586½ foot barge train had entered this 600 foot lock.

The initial cause of action was brought by Chotin under the Suits in Admiralty Act 46 U.S.C. § 741–752 (1920) (Admiralty Act). Chotin alleged that the government's negligence caused the damage to Barge 3390. The government responded with a third-party complaint in rem against all three vessels of the Chotin barge train under the River and Harbors Act 33 U.S.C. §§ 408, 412 for damages to the upstream miter gate. It also seeks the penalty authorized by 33 U.S.C. § 411 (1899).[1]

The District Judge found the facts as follows:

### The District Court's Findings of Fact

During the evening of January 20, 1982, the flotilla comprised of the tug M/V Keegan, Barge 1794 and Barge 3390 arrived at the Wilson Lock. The night was foggy and rainy. Captain Horton, the pilot of the tug, radioed Lynn Wallace the only lock opera-

---

1. The United States had also counterclaimed against the Chotin vessels in personam for damages but as the District Judge's opinion notes "*By agreement* the government's *in personam* negligence claim was dismissed with prejudice on Chotin's motion at the close of the government's case." The District Judge also pointed out that "the government conceded it had presented no proof to allow it to recover on an

affirmative negligence claim." But the District Judge also stated that the dismissal did not preclude the government from defending the suits in admiralty claims on the basis of the Chotin vessels' contributory negligence nor did it prevent the United States from possible recovery for damage to its lock under 33 U.S.C. §§ 408 and 412.

tor on duty that night for permission to enter the lock. Wallace opened the lock's downstream gates, and authorized Keegan and tow to enter the lock chamber. Once in the chamber, Horton brought the Keegan and tow to a stop alongside of and parallel to the lock's land wall, and approximately 4 to 5 feet from the upper "miter" gate. The proofs revealed that it is customary to secure a flotilla in a lock chamber by only two lines. One line is a towing line which prevents forward movement, and one is a backing line which prevents backward movement. The Keegan's crew then secured the flotilla to the lock's land wall. In this instance, the lead on the towing line was too long and the crew had to change it to a backing line. Captain Horton then reversed the Keegan's engines to remove the slack from the backing line. First mate Stewart then reported to the Captain that the lines were secure. Horton returned the Keegan's throttles to neutral, thereby equalizing the stress on the two lines. Horton then reported to Wallace, the lock operator, that the flotilla was secure.

At this lock in an upstream lockage, the lockmaster is about 90–100 feet above the flotilla when the lines are tied. Wallace from the tower of the downstream control room could only see the stern of the Keegan. When he was satisfied that the flotilla was tied far enough forward to allow the downstream miter gates to close, he closed the gates. Wallace did not visually check the mooring lines. Horton testified that after the downstream gates were closed, the flotilla could have been moved astern to allow more room between the head of the lead barge and the upstream lift gate, but this was not done. Once the downstream gates were closed, the fog became denser and visibility worsened. Wallace testified that he could not see the mooring lines nor the distance between the head of the tow and the upstream gate. Wallace turned on the locks' filling valve from the lower control station and boarded a motor scooter and headed towards the upstream control station. He made a stop at the lock's main building, located between the downstream

and upstream control stations to pick up a newspaper to deliver to the barge crew. Wallace then proceeded to the lock's second mooring bit which was located approximately 54 feet downstream from the upstream gate. Wallace attempted to examine the mooring line, but could not do so. Visibility was so bad that Wallace could not see four Keegan crew members who were standing on the deck tending the mooring line. Wallace continued to the next mooring bit located approximately 54 feet downriver from the upstream gate. Once again he was unable to see the mooring lines or the head of the tow. Wallace decided to stop the flow of water into the lock. He went to the upper control station but was unable to get in because his key would not work.

While Wallace was traveling from the lower control station to the upper control station, the flotilla was experiencing "surging." (The tug and tow are moving upstream and downstream in the chamber). A certain amount of surging is expected and occurs even when the flotilla is moored properly. The first episode of surging occurred when the water first began to enter the chamber. Crew member Gaston noticed some slack in the towing line and retied the line on Barge 3390. Horton testified that he thought the first episode was more severe than usual and he engaged the starboard engine astern to "hold it back." First mate Stewart then walked forward to check the distance between the bow of Barge 3390 and the upstream gate. At that time, the bow was not in danger of hitting the upstream gate and he did not check the towing line. Approximately eight minutes later another episode of surging occurred which lasted approximately six to eight minutes. It was caused by the filling valves automatically increasing their openings for a 15 foot lift of the barge train. Horton did not call the lock operator to inform him of the surging, but waited for Wallace to notify him if something was amiss.

When the tow rose to a few feet below the gate, first mate Stewart saw the reflec-

tion of the tow's running light on the gate and realized that the bow of the lead barge was close to the gate. Stewart sent deckhand Russell to examine the extreme forward edge of the two to determine the clearance. Russell reported that impact was imminent. Stewart called Horton who engaged the engine astern to back the flotilla away from the upper gate. Horton then attempted to call Wallace to shut off the water. By then, it was too late to avoid impact. The bow of Barge 3390 struck the upstream lift gate. The water continued to rise along with the stern of Barge 3390 and the rest of the flotilla. The bow of Barge 3390 became stuck under the gate. As a result, the coupling between Barge 3390 and Barge 1794 broke and the bow rake of Barge 3390 disconnected.

After trial to the court on June 12, 1984 the District Court entered its opinion and judgment order and held: 1) Applying maritime comparative negligence principles, the District Court found the United States 50% liable for Chotin's damages because the lockmaster breached his duties found in 33 C.F.R. 207.300 to control and manage the lock and to direct and supervise mooring operations of the Keegan and her tow during lockage. Chotin was found to be 50% contributory negligent in causing the damage to the Barge by failing to manage and operate the Keegan and its two barges properly during the lockage. 2) The in rem third-party defendants were found to be strictly liable under 33 U.S.C. §§ 408 and 412 for all of the United States' damages to its upstream lock gate. The net effect of these rulings was a recovery by the United States of $136,374.51 plus prejudgment interest. The judgment and order did not address assessment of the penalties against each offending vessel provided by 33 U.S.C. § 412. Chotin noticed its appeal from the District Court's judgment on July 17, 1984. On August 8, 1984, the United States noticed its cross-appeal from that part of the judgment which found it liable to Chotin and the District Court's failure to assess the mandatory penalties provided in 33 U.S.C. § 412.

Neither party appears to contest the District Judge's findings of fact quoted above. Further the parties stipulated as to the damages to the barge and the lock. There is, however, strong dispute about the legal conclusions and judgments at which the District Judge arrived.

### Discussion

As we noted at the beginning of this opinion, the duties of care in accomplishing this lockage were markedly heightened for both parties by dark of night, rain and fog, all of which hindered essential visibility for both the lockmaster and the captain and crew of the barge train. The lockage was further complicated by the minimal 13½ foot clearance after this 586½ foot barge train entered this 600 foot lock.

On a clear day the routine care which was provided by the parties might well have accomplished a passage without incident. Indeed the barge train did enter the lock and tie up safely. However, a major factor in every passage of such a train through this lock was control of the enormous forces required to lift the weight of the entire barge train a perpendicular distance of 90 to 100 feet in a relatively few moments.

Initially positioning and tying up the barge train with the bow of the lead barge within 4½ feet of the upstream gate was obviously risky. Undertaking the second perpendicular lift of 15 feet, without first, eyeball crewman surveillance of the 4½ foot gap and second, immediate radio contact and control of the barge train by the Chotin Captain and similar observation and control of the waterflow by the lockmaster was, as found by the District Judge, proximate negligence by each party. The specifics of such proximate negligence, as we find them to be, as to Chotin were that although it had a four man crew, no member of the crew was positioned so as to observe the effect of any forward surge created by the 15 foot lift until it was too late to give the Captain notice (by radio or signal) to engage the tug's engines to restrain the tow or to give timely notice to the Captain so as to allow notice to the

lockmaster to cut off the inflow. The specifics of such proximate negligence, as we find them to be, as to the lockmaster were first, a failure to recognize that the barge train was not secured at as substantial a distance from the upstream lock gate as was practicable under the circumstances, second, a failure to direct the Captain of the barge train to station a lookout in radio or signal contact with him, third, a failure, to himself establish and maintain radio contact with the Captain during the inflow and fourth, his inability to open the door to the upper control station. In regard to these findings, see the extraordinary powers given to the lockmaster by the Secretary of the Army under 33 U.S.C. § 1 as quoted in Appendix 1 to this opinion.

We believe that the judgments of the District Court affirmed above represent as fair an assessment of the respective fault of the parties and as fair a division of the parties' damages as the law currently allows. We also believe that where the fault of the United States is such as to equal that of Plaintiff-Appellant Chotin, a result which as here makes the United States whole (or better than whole)[2] is obviously unfair.

■ We have not had cited to us nor do we find a maritime case exactly on point in relation to the facts of this case. It is true that 33 U.S.C. §§ 408 and 412 clearly impose pecuniary penalties upon any "vessel" for damages done by it. The District Judge has read these statutes as prohibiting him from considering the 50% contribution to the negligence which caused this accident on the part of the United States in assessing damages to the upstream lift gate.

While this was clearly at one time the law, we do not believe that it any longer is. Two leading authorities have made the following argument for the Supreme Court to adopt the proportional fault doctrine without awaiting congressional action.

[T]here is no reason why the Supreme Court cannot at this late date 'confess error' and adopt the proportional fault doctrine without Congressional action. The resolution to follow the divided damages rule, taken 120 years ago, rested not on overwhelming authority but on judgments of fact and of fairness which may have been tenable then but are hardly so today. No 'vested rights,' in theory or fact, have intervened. The regard for 'settled expectation' which is the heart-reason of ... *stare decisis* ... can have no relevance in respect to such a rule; the concept of 'settled expectation' would be reduced to an absurdity were it to be applied to a rule of damages for negligent collision. The abrogation of the rule would not, it seems, produce any disharmony with other branches of the maritime law, general or statutory. (footnote omitted).

G. Gilmore & C. Black *The Law of Admiralty* 531 (2nd Ed.1975).

In the October term of 1974 the Supreme Court revisited the divided damages rule and held in place thereof, that the liability for damage occasioned by two or more parties should be "allocated among the parties proportionately to the comparative degree of their fault." The case was *United States v. Reliable Transfer Company, Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The opinion was by Mr. Justice Stewart writing for a unanimous court. The holding of the case is:

We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

---

2. If the terms of 33 U.S.C. §§ 408 and 412 are followed literally, the United States will recover, in addition to its full damages, a criminal penalty of $500 to $2500. We believe these results would clearly be inequitable. As to 33 U.S.C. § 412, there certainly has been no criminal intent shown.

*Reliable Transfer,* 426 U.S. at 411, 95 S.Ct. at 1715.

We recognize, of course, that Barge 3390's collision with the upstream gate on the Wilson Lock was not a "collision" in the sense of a collision at sea involving two or more ships nor was it precisely a "stranding" as that term would normally be used in admiralty affairs. But certainly the episode partakes of each and we are able to ascertain no reason to fail to apply the equitable allocation called for by *Reliable Transfer* under the facts of our instant case.

We recognize, of course, that the United States has argued strongly that it is entitled to the benefit of the discretionary function exception. In this regard, the United States relies upon *U.S. v. S.A. Empresa De Viacao Aerea Rio Grandense, (Varig Airlines)* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). In *Varig* the Supreme Court discussed the differences between functions which trigger the discretionary function exception and those functions which do not. In *Varig,* the Supreme Court said:

> As in *Dalehite* [346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)] it is unnecessary—and indeed impossible—to define with precision every contour of the discretionary function exception. From the legislative and judicial materials, however, it is possible to isolate several factors useful in determining when the acts of a Government employee are protected from liability by § 2680(a). First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. As the Court pointed out in *Dalehite,* the exception covers "[n]ot only agencies of government ... but all employees exercising discretion." 346 U.S., at 33, 73 S.Ct. at 966. Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employ-

ee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

> Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.[11] Time and again the legislative history refers to the acts of regulatory agencies as examples of those covered by the exception, and it is significant that the early tort claims bills considered by Congress specifically exempted two major regulatory agencies by name. See *supra,* at ——. This emphasis upon protection for regulatory activities suggests an underlying basis for the inclusion of an exception for discretionary functions in the Act: Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took "steps to protect the Government from liability that would seriously handicap efficient government operations." *United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963).

> [11] Even the dissenters in *Dalehite* read the legislative history of the discretionary function exception as protecting "that type of discretion which government agencies exercise in regulating private individuals." *Dalehite v. United States,* 346 U.S., at 58, n. 12, 13 S.Ct., at 979, n. 12 (Jackson, J., dissenting).

*Varig,* 104 S.Ct. at 2765.

As we see this case, it does not by any means represent "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. The parties in this case admittedly faced with a serious emergency nonetheless were guilty of ordinary "garden-variety" negligence.[3] Understandable per-

---

3. We recognize that the phrase "garden-variety" negligence was used by the Court of Appeals for

the Fifth Circuit in *United States v. Tug Colette Mallory,* 507 F.2d 1019, 1022 (5th Cir.1975), and

haps as these actions or inactions were on the part of the one lonely United States representative and the captain and crew of the barge team, they nonetheless consisted of failing to see what could readily have been seen, and do what could readily have been done to prevent the damage both to the barge and to the lock. Nor will requiring the United States to assume commensurate liability for damages to the ship and the lock gate, in our judgment, "seriously handicap efficient government operations." *Varig,* 104 S.Ct. at 2765.

In short, we believe that this case falls under the principles of *Reliable Transfer* and not under the principle of *Varig Airlines.*

■ We have considered the question of whether or not this calls for remand to the District Court because it failed to give effect to *Reliable Transfer.* We conclude that this is not necessary since the District Court has already plainly indicated its belief that an equal division of damages is as fair an approximation as it could make. Our review of the facts supports this conclusion and we certainly cannot declare clearly erroneous the District Court's findings of fact as to equal negligence on the part of both Chotin (and its vessels) and the United States.

The judgment of the District Court is then affirmed in part and reversed only as to allocation of damages to the upstream miter gate. As to this issue on remand, the District Court will assess 50% of the damage as determined above to the United States and 50% to the Chotin vessels involved in this accident and enter judgment accordingly.

## APPENDIX I

33 U.S.C. § 1 provides:

It shall be the duty of the Secretary of the Army to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement, covering all matters not specifically delegated by law to some other executive department. . . .

The regulations found in 33 C.F.R. 207.-300(a) and (m)(1)(i) upon which the District Court predicated the Government's liability provide:

(a) *Authority of Lockmasters.* The lockmaster shall be charged with the immediate control and management of the lock, and of the area set aside as the lock area, including the lock approach channels. He shall see that all laws, rules, and regulations for the use of the lock and lock area are duly complied with, to which end he is authorized to give all necessary orders and directions in accordance therewith, both to employees of the Government and to any and every person within the limits of the lock or lock area, whether navigating the lock or not. No one shall cause any movement of any vessel, boat, or other floating thing in the lock or approaches except by or under the direction of the lockmaster or his assistance. In the event of an emergency, the lockmaster may depart from these regulations as he deems necessary. The lockmasters shall also be charged with the control and management of Federally constructed mooring facilities.

(m)(1) *Mooring. At Locks.* (i) All vessels when in the locks shall be moored as directed by the lockmaster. Vessels shall be moored with bow and stern lines leading in opposite directions to prevent the vessel from "running" in the lock. All vessels will have one additional line available on the head of the tow for emergency use. The pilothouse shall be

---

that the Fifth Circuit went on to hold that "garden-variety" contributory negligence is not a defense to suit by the United States for damage to its property. The Fifth Circuit, however, was writing just two months before the decision of the Supreme Court of the United States in *Reliable Transfer.* If we were writing without *Reliable Transfer* before us, we too would decide this case as the Fifth Circuit decided *Tug Colette Mallory.*

attended by qualified personnel during the entire locking procedure. When the vessel is securely moored, the pilot shall not cause movement of the propellers except in emergency or unless directed by the lockmaster. Tying to lock ladders is strictly prohibited.

KRUPANSKY, Circuit Judge, dissenting in part, concurring in part.

Upon review of the majority opinion, I am constrained to concur, in part, and respectfully dissent, in part, for the reasons hereinafter set forth. Initially, I am in accord with the majority's conclusion to affirm the trial court's judgment in applying maritime comparative negligence principles and assessing 50% of the liability for Chotin's damages against the United States arising as a result of the lockmaster's negligence anchored in 33 C.F.R. 207.300 in failing to control and manage the lock and to direct and supervise mooring operations of the Keegan and her barge train during lockage; and in the trial court's finding that Chotin was 50% contributorily negligent in causing damage to barge # 3390 by failing to manage and operate the Keegan and its barge train properly during the lockage.

I also join the majority in characterizing the negligent acts of the lockmaster as ordinary "garden variety" negligence not within the parameters of the discretionary exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a). A factual analysis discloses that the lockmaster's breach of duty in no way resulted from a policy judgment or policy decision implicit to invoking the discretionary exemption intended by Congress.

The government's reliance upon *U.S. v. S.A. Empresa De Viacao Aerea Rio Grandense,* (Varig Airlines) 467 U.S. 787, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) to support its application of the discretionary exemption to the facts of this case is misplaced. *Varig Airlines* reaffirmed the Court's earlier interpretation of § 2680(a) articulated in the seminal case of *Dalehite v. U.S.,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

In *Varig Airlines* the Supreme Court recognized that:

As in *Dalehite,* it is unnecessary—and indeed impossible—to define with precision every contour of the discretionary function exception.

467 U.S. at ——, 104 S.Ct. at 2765.

Having made that pronouncement, the Court proceeded to define the criteria against which the facts of any given case should be compared in resolving the protection afforded by the discretionary exemption imposed by § 2680(a) of the Federal Tort Claims Act by stating:

From the legislative and judicial materials, however, it is possible to isolate several factors useful in determining when the acts of a Government employee are protected from liability of § 2680(a). First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. As the Court pointed out in *Dalehite,* the exception covers "[n]ot only agencies of government ... but all employees exercising discretion." 346 U.S., at 33, 73 S.Ct., at 966. Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.

*Id.*

The inexhaustible line of citations relied upon by the government simply emphasizes the ad hoc application of facts to the *Varig Airlines* criteria to identify the discretionary exception.

Enjoining the dictates of *Varig Airlines* upon the developed facts of the instant case, I cannot, in conscience, conclude that the lockmaster's negligence on the night of January 20, 1982 involved executive and/or

administrative decisions grounded in social, economic and political policies of the kind that Congress intended to safeguard from judicial second-guessing. In the case at bar, the government had exercised its policy by promulgating regulations to ensure the safe passage of vessels during the locking procedures. It was the lockmaster's negligent performance in ignoring the government's regulations that gave rise to the government's negligence in causing damage to Chotin's barge.

The government's attenuated interpretation of *Varig Airlines* would have this Court extend the discretionary exemption, without exception, to all governmental activities undertaken by governmental employees under circumstances involving the exercise of judgment. In noting that pragmatically all negligent conduct, to a greater or lesser degree, is the product of a voluntary election to perform an act I am constrained to observe that the government's suggested interpretation would confer the discretionary exception on all governmental activities and conduct that permitted or required the exercise of an election or option, which interpretation would be in derogation of the congressional intent incorporated into the FTCA and SIAA. In *General Public Utilities Corporation v. United States*, 745 F.2d 239, 245 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1985), a post-*Varig Airlines,* case, the Third Circuit demonstrated its understanding of *Varig Airlines:*

> The exemption from the Tort Claims Act is based on the nature of the governmental discretionary function, not whether there is an option to choose. Regulatory activities are within the exemption, not because alternatives exist in particular circumstances, but because of the fundamental character of the role assigned to the agency.

Likewise, in *Canadian Transport Company v. United States,* 663 F.2d 1081 (D.C. Cir.1980), the D.C. Circuit recognized the existence of a discretionary function exception in the SIAA:

The government appears to argue that if an action involves the exercise of judgment by a government employee, the action is discretionary and the United States is immune from suit.... Courts have recognized, however, that giving such a broad reading to the term "discretionary" would effectively immunize almost all government activity from suit under the FTCA.

663 F.2d at 1086. The government's proposed interpretation would effectively eviscerate the legislative intent reflected in the FTCA and the SIAA. In the case at bar the lockmaster abdicated his duties to immediately control and manage the locking procedure; to supervise the mooring of the vessel and the barge flotilla in the lock; to supervise the tying of the backing and towing lines during lockage; to check the distance between the head of the flotilla and the upstream left gate after the captain of the Keegan informed him that the flotilla had been secured in the chambers; to ultimately discontinue the locking procedure when it was obviously dangerous; to stop the flow of water into the chamber to prevent the disaster because, having forgotten the keys to the upper control chamber in the lower control station, he was unable to enter the upper control station to close the necessary valves. In sum, the lockmaster's performance from the inception of the locking procedure was nothing short of a comedy of errors. Accordingly, I would concur with the majority's conclusion that the lockmaster's conduct did not fall within the discretionary exception of the FTCA as urged by the government on this appeal.

I cannot, however, endorse the majority's interpretation of the Rivers and Harbors Act, 33 U.S.C. §§ 408 and 412 and the majority's disposition of the issue joined thereunder.

Those sections provide:

It shall not be lawful for any person or persons to ... alter, deface, destroy, move, injure, ... *or any manner whatever impair the usefulness* of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, *or other work* built by the United

States ... for the preservation and improvement of any of its navigable waters or to prevent floods ... (emphasis supplied).

33 U.S.C. 412—.... And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft ... and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof.

Initially, my dissent is predicated upon this Circuit's precedent articulated in *Hines, Inc. v. United States*, 551 F.2d 717, 724 (6th Cir.1977), a case factually analogous to the instant case, wherein it was unequivocally announced "Section 408 imposes strict liability, as compared to § 409's requirement of negligence. Section 412 also provides that 'any boat, vessel ... or other craft used or employed in violating any of the provisions of sections ... 408 and ... of this title ... shall be liable for ... the amount of the damages done by said boat, vessel or other craft ...'" See *United States v. Tug Colette Mallory*, 507 F.2d 1019 (5th Cir.1975).

*Hines, Inc.* thereupon proceeded to favorably adopt the Seventh Circuit's rationale enunciated in *United States v. Ohio Valley Co., Inc.*, 510 F.2d 1184, 1188 (7th Cir.1975):

> [T]he purpose of the combined effect of sections 14 and 16 [33 U.S.C. §§ 408 and 411] is to provide funds for the replacement and maintenance of improvements built by the United States. This purpose is implemented through an absolute liability standard. Thus, it would be wholly inconsistent to apply the limitation of liability provisions of section 183(a) to the absolute liability provisions of section 14, while at the same time not applying them to section 15 (wreck statute) [33 U.S.C. § 409] which speaks in

terms of "voluntary or carelessly" allowing a vessel to sink. Furthermore, section 183(a) speaks in terms of lack of "privity and knowledge." That phrase implies that the owner be unaware of the fault in his vessel that caused an accident. Since the triggering mechanism for section 183(a) limitation of liability is tied to an awareness of negligence, and because negligence is not significant in actions under sections 14 and 16, it follows that the limitation of liability provisions are inapplicable to those sections.

The pronouncements of the Seventh Circuit in *United States v. Ohio Valley Co.* and the Sixth Circuit's resolution of *Hines, Inc. v. United States* were echoed by the Eighth Circuit in *United States v. Logan and Craig Charter Service*, 676 F.2d 1216 (8th Cir.1982) wherein that court further analyzed the purpose of the Rivers and Harbors Act, 33 U.S.C. §§ 408 and 412:

> The purpose of the Act is to protect, preserve, and make safe the Nation's navigable waterways, and the United States is the principal beneficiary of the Act. *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379 [385], 19 L.Ed.2d 407 (1967). The Act should be construed broadly to effectuate its goals. *Wyandotte Transportation Co. v. United States, supra; United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). Congress imposed strict liability under sections 408 and 412 in order to provide funds for the replacement and maintenance of improvements made by the United States; to interpret those sections in such a way as to limit liability would be inconsistent with the intention of Congress.

573 F.2d at 997.

As early as 1906, the First Circuit laid to rest challenges to the Rivers and Harbors Act in *New England Dredging Co. v. United States*, 144 Fed. 932, 933 (1st Cir.1906), wherein it elaborated on the purpose underlying the congressional promulgation when it explained:

If the view of the United States is upheld, it is by virtue of the modern body of law, existing in this country, as well as in England, which is founded upon the arbitrary but necessary police power inherent in government, rather than upon general principles which govern in other cases.

This exceptional rule, founded largely upon statutes enacted for the enforcement of the plenary power in government is recognized as applying to ... a variety of conditions relating to the public health and public good.

As to wrongs within this rule, the penalty is supposed to attach to the offending act without regard to the question of willfulness or intent, and without regard to the question of mistake or innocence. The rule is, of course, in derogation of the principles of the common law, and its drastic quality is justified upon grounds of necessity, and as in the interest of the public good.

The expressed object of resorting to the exercise of plenary power through arbitrary and exceptional remedies in such matters, is to better safeguard the public good in situations where the public good is easily subject to imposition and injury through heedless, inadvertent, or indifferent violations of laws enacted for the general welfare....

Thus, having declared that strict liability under 33 U.S.C. §§ 408 and 412 of the Rivers and Harbors Act arises from a violation of the above statutes and not pursuant to common law negligence and having further declared that the trial court properly assessed 50% of the liability proximately contributing to the damage of the upper miter gate of the Wilson Lock on the Tennessee River against Chotin, it must, pursuant to the mandate of the statutory language, reimburse the government for the entire cost of the damage to the described miter gate.

Chotin argues that the following dicta in *United States v. Tug Collette Mallory*, has in some way eroded the interpretations of strict liability attributed to 33 U.S.C. §§ 408 and 411:

> Defenses to the strict liability imposed by these statutes are not well-developed; however, we have no doubt that if the tug had shown the gate man to be solely at fault in causing the accident a defense would have been established.

507 F.2d at 1022. These arguments, however, are not persuasive because the cited reference, in my opinion, does not abuse the conclusion of strict liability imposed by § 408 and 411 of the Act. The precise language of those sections forecloses Chotin's contentions. The pertinent specifications in the respective sections read as follows:

> 33 U.S.C. § 408. It shall not be lawful for *any person or persons to* ... alter, deface, destroy, move, injure,

> .   .   .   .   .

> 33 U.S.C. § 411. *Every person* and *every corporation* that shall violate, ...
> 33 U.S.C. § 412—.... And any boat, vessel, scow, raft, or other craft *used or employed in violating any of the provisions of sections* 407, 408, and 409 of this title *shall be liable* for ...

Mindful of the congressional intent to make the government the principal if not the sole beneficiary of the Rivers and Harbors Act, it is obvious from the foregoing, that the strict liability imposed by the above sections is directed toward any culpable persons and/or corporations that "... alter, deface, destroy, move, injure, ... or in any manner whatsoever impair the usefulness of any sea wall, bulkhead, jetty, wharf, pier or other work built by the United States ..." except the United States, even under circumstances where the government contributed in some greater or lesser degree to said damage. Accordingly, it must necessarily follow that under the circumstances wherein the government was the sole and only cause of the damage to its property and the ship owner was free of any negligence whatsoever, the vessel owner is not a person or corporation within the meaning and intent of the above cited sections. Stated differ-

ently, total governmental culpability affords a compatible complete defense if not the only defense to the strict liability imposed by the Act.

I would therefore reaffirm the pronouncements of strict liability imposed by 33 U.S.C. §§ 408, 411 and 412 as interpreted by this Circuit in *Hines, Inc. v. U.S.* and all other circuits that have addressed the issue [1] and affirm the trial court's disposition to require Chotin to assume payment for the total amount of the repairs to the upstream miter gate of the Wilson locks situated on the Tennessee River.

---

1. The majority would support the application of comparative negligence principals by assessing 50% of the damages to the upstream miter lock against the United States by citing to *United States v. Reliable Transfer, Inc.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715. Initially, as the majority opinion notes the collision of barge # 3390 with the upstream miter gate of the Wilson lock was not a "collision" at sea involving two or more ships nor was it a "stranding" as that term is applied under admiralty law. Moreover, the *Reliable Transfer, Inc.* decision was not impacted by a strict liability congressional enactment designed to benefit the United States. I find no factual or legal comparison between the instant case and *Reliable Transfer, Inc.*