TODD SHIPYARDS CORPORATION, on its own behalf and as chartered owner and bailee of the Deck Scow MICHAEL COSGROVE, Libelant,

v.

MORAN TOWING & TRANSPORTATION CO., Inc., Respondent.

No. 19354.

United States District Court
E. D. New York.
April 26, 1956.

Crowell & Rouse, New York City, for libelant, by George Varian, New York City, Advocate.

Burlingham, Hupper & Kennedy, New York City, for respondent, by Richard W. Palmer, New York City, Advocate.

**108**

RAYFIEL, District Judge.

The libelant sues herein for damages to the scow Michael Cosgrove, hereinafter called The Cosgrove, sustained on March 24, 1948.

The facts follow: The Cosgrove, a flat deck harbor scow, with deckhouse aft, 117.8 feet in length, 33 feet in breadth, and 7.5 feet in depth, owned by Shamrock Towing Co. Inc., had been chartered to the libelant on a day to day basis for an indefinite period, at a stipulated daily rate of hire.

On March 24, 1948, The SS River Raisin was in the libelant's Hoboken plant for the removal of her spar decking, consisting of a spider framework of steel girders above her weather deck, which had been used to carry emergency material during the war. The Cosgrove was being employed to receive the girders as they were removed from the ship.

The Cosgrove was moored on the south side of Pier J at the plant, between the bow of The River Raisin and the outrigger of drydock No. 11, the distance between which was about 90 feet. She was made fast with four lines: one from her aft starboard corner to the outrigger of drydock No. 11; another from her aft starboard corner to a cleat on Pier J; a third from her aft port corner to a cleat on Pier J; and the fourth from her forward port corner to a bitt on the starboard bow of The River Raisin. She was moored at an angle, with her aft port corner approximately 15 feet from the side of Pier J, and her aft starboard corner approximately 8 to 10 feet from the outrigger of drydock No. 11.

The girders were being transferred from The River Raisin to The Cosgrove by means of a traveling crane located on Pier J, but because of the disadvantageous position of the scow, and the resultant difficulty and delay in effecting the transfer operation, the libelant's employees decided to have The Cosgrove shifted from the south to the north side of Pier J, and directly opposite The River Raisin, so that the crane would merely have to remove the girders from The River Raisin and swing them over onto The Cosgrove.

Accordingly, one Hennelly, libelant's supervisor of transportation, after obtaining authorization therefor from its night superintendent, telephoned the respondent at about 6:30 P. M. on the date of the incident, requesting it to furnish a tugboat to make the shift of The Cosgrove. He spoke with the respondent's dispatcher, one Grandone, who told him that no tug of his own was available for the job but that he would try to get one. He succeeded in locating The Sound and Harbor No. 2, hereinafter referred to as The S & H No. 2, a tug owned by Sound and Harbor, Inc. She was at Pier 56, North River, and Grandone instructed Sound and Harbor's dispatcher to send her to the libelant's Hoboken plant to shift The Cosgrove. Shortly thereafter Hennelly again telephoned Grandone and was informed by the latter that he had located The S & H No. 2, and that she was on her way.

Shortly thereafter The S & H No. 2 arrived at libelant's plant. Hennelly went to the outrigger of Drydock No. 11 and informed her deckhand that he was to shift the scow from the south to the north side of Pier J, directly opposite The River Raisin.

Hennelly pointed out to the deckhand, who went aboard the scow with him, that the girders had been placed on the deck in a somewhat crisscross manner, and that some of them extended beyond her side from 8 inches to a foot. The deckhand remained aboard The Cosgrove and made fast a line from her forward port corner to The S & H No. 2 which then proceeded to tow The Cosgrove into the slipway. Despite a warning by Hennelly to proceed slowly to avoid striking the bow of The River Raisin with any of the overhanging girders on The Cosgrove, the tug towed The Cosgrove with such speed as to cause the projecting girders to strike the bow of The River Raisin, and force them against and onto the deckhouse of the scow, damaging it. After the damage had been done lines were run from both forward corners of

The Cosgrove to the tug, which then moved her out slowly and shifted her to the north side of Pier J without further incident.

On March 30, 1948, the libelant notified the respondent that it was making a claim against it for the damage sustained by The Cosgrove on March 24, 1948, and also notified it that a survey of such damage would be held at 3:00 P.M. on that day. The survey was not held on that day, but, by letter dated April 12, 1948, was adjourned to April 13, 1948, at 2 P. M. The respondent failed to attend. On April 23, 1948, the libelant sent the respondent an invoice in the sum of $2,318, which it had received from Shamrock Towing Co., Inc., covering the damage claimed to have been sustained by The Cosgrove. The invoice was returned to the libelant.

In the meantime, Sound and Harbor, Inc. had billed the respondent in the sum of $58.97 for the services of S & H No. 2 in shifting The Cosgrove, and the respondent in turn billed the libelant for said services in the sum of $65.66, which it paid to the respondent.

█ █ The evidence presented at the trial convinced me that The S & H No. 2 shifted The Cosgrove in such a careless and negligent manner as to cause the damage which the latter sustained. There is no doubt, then, that the libelant, the charterer of The Cosgrove, is liable to her owner, Shamrock Towing Co. Inc., for such damage. In the case of O'Donnell Transp. Co., Inc., v. M. & J. Tracy, Inc., 2 Cir., 150 F.2d 735, Judge Augustus N. Hand enunciated the law on the subject when he said, at page 737,

> "It has long been held that a charterer of a barge who hires a tug to tow it is liable for the negligence of the tug. It was so held in Smith v. Bouker, 2 Cir., 49 F. 954, by Judges Wallace and Lacombe; in Gannon v. Consolidated Ice Co., 2 Cir., 91 F. 539, By Wallace, Lacombe & Shipman, JJ; in White v. Upper Hudson Stone Co., 2 Cir., 248 F. 893 (certiorari denied 246 U.S. 665, 38

S.Ct. 335, 62 L.Ed. 929), by Rogers, Hough and L. Hand, JJ., and in The E. T. Halloran, 2 Cir., 111 F.2d 571, by Swan, Chase & Patterson, JJ. As Judge Hough said in White v. Upper Hudson Stone Co., 2 Cir., 248 F. 893, 895; 'The obligation was that of a bailee, and liability was not discharged by showing that the vessel had been intrusted to the care of another, and injured either by that other's negligence or while in such other's charge.'" And further, also on page 737, Judge Hand said: "Liability is imposed upon charterers upon the theory that they should at all times care for the barge while she is under charter to them and that they are under a duty which may not be delegated to others. While they do not warrant the safety of the barge they have an obligation to have it properly cared for by any person with whom they entrust it."

The respondent disclaims any responsibility to the libelant, contending (1) that the latter, not being the owner of The Cosgrove, is not the proper party in interest, and (2) that, having no tug of its own available, it obtained The S & H No. 2 as an accommodation to the libelant, acting, in so doing, as the latter's agent, and hence is not liable for the damage to The Cosgrove.

█ The first contention is without merit. Judge Swan stated the law applicable to the instant case in The W. C. Block, 2 Cir., 71 F.2d 682, when he said, at page 683,

> "For centuries it has been the settled rule, both at common law and in the admiralty, that either the bailor (in the present case, the buyer, McNulty) or the bailee (the libelant) might sue the tort-feasor for destruction of the bailed goods. The Beaconsfield, 158 U.S. 303, 15 S.Ct. 860, 39 L.Ed. 993; Pendleton v. Benner Line, 246 U.S. 353, 354, 38 S.Ct. 330, 62 L.Ed. 770; The Winkfield, 1902 L.R.Prob. 42;

Holmes, The Common Law, 167 et seq. Pollack & Maitland, History of English Law, vol. 2, p. 169 et seq."

The libelant's right to bring this action is, therefore, clearly established.

I disagree, also with respondent's second contention. The evidence discloses that respondent's dispatcher communicated with Sound & Harbor's dispatcher, ascertained that he had a tug available, and, as Grandone testified, (S.M.P. 311) "ordered a tug" to proceed to libelant's Hoboken plant to make the shift of The Cosgrove. Grandone then entered the transaction on his dispatcher's sheet. Subsequently, Sound and Harbor billed the respondent for the services of the tug, less a 7½% discount. The respondent, in turn, billed the libelant at the full rate.

I find that the libelant hired the respondent to perform the job of shifting The Cosgrove; that the respondent, not having a tug of its own available, hired Sound and Harbor as its sub-contractor or agent to do the work for it (the respondent); that it billed the libelant for the services of the tug and received payment therefor; that it paid Sound and Harbor for such services the amount received from the libelant, less a deduction of 7½% thereof for its compensation; that Sound and Harbor was not an independent contractor, hired by the respondent as the libelant's agent, but, rather, a subcontractor, or agent of the respondent, and that therefore, under the doctrine of respondeat superior, the respondent is liable for the damage sustained by The Cosgrove.

It is unfortunate, as was disclosed at the trial, that The S & H No. 2 was scrapped, and that Sound and Harbor, Inc. is no longer engaged in business, since Sound and Harbor, Inc. was undoubtedly also liable to libelant. Judge Frank in Rice v. The Marion A. C. Meseck, 2 Cir., 148 F.2d 522, at page 523, said,

"The damage to the tug was the result of forcing the barge into place against the ice. The trial court judge did not find that no one was negligent nor that the scow had contributed to the damage. He exculpated the tug on the theory that the directions and advice given by the steamship company's employees insulated the tug from liability. That theory is untenable. The tug owed the scow the duty 'to do the work in a seamanlike manner.' It may be that the steamship company and its employees, had they been sued by the libellant, would have been held liable; but that fact could not free the tug from liability. 'That a principal is liable for a wrong does not necessarily immunize his agent. * * * The books are full of instances where dual liabilities are not alternatives or mutually exclusive; a plaintiff may be lucky enough to have a two-stringed bow.' [Citing cases.] The tug's master, in order to do his work in a seamanlike manner, should not have relied on the stevedore's advice, but should himself have ascertained the condition of the ice." (Emphasis added.)

The respondent also raised the defense of laches. I find no merit in that defense. The evidence discloses that the respondent was notified of the libelant's claim on March 30, 1948, less than a week after the accident, and that there were conversations, negotiations and correspondence between the libelant and the respondent, as well as between libelant's counsel and respondent's representatives, until the commencement of this action on November 16, 1949, less than two years after the occurrence.

Decree in favor of the libelant. Submit proposed findings of fact, conclusions of law and decree in conformity herewith.