**In the matter of the Complaint of WALKER'S MIDSTREAM FUEL AND SERVICE COMPANY, a corporation, for Exoneration from, or Limitation of Liability.**

**Civ. A. Nos. C-81-0189-P, C-82-0059-P.**

United States District Court,
W.D. Kentucky,
Paducah Division.

June 4, 1986.

Gary T. Sacks, Goldstein and Price, St. Louis, Mo., W. Pelham McMurry, Paducah, Ky., for Walker's Midstream.

James A. Harris, Jr., Paducah, Ky., W.J. Larzelere, Jr., New Orleans, La., for R & W Marine, Inc.

Ann D. Nunn, Louisville, Ky., James A. Lewis, for the U.S.

Frank Thacktson, Greenville, Miss., Richard C. Roberts, Paducah, Ky., for Bunge Corp.

## MEMORANDUM OPINION

JOHNSTONE, Chief Judge.

This admiralty action arose out of a marine casualty which occurred during the early morning hours of March 3, 1981, at the Smithland Locks and Dam near Mile 918.5 of the Ohio River. On that date, the downriver bound M/V ROBERT DARON (hereinafter "DARON") and its tow of six loaded grain barges struck the upriver end of a guard wall causing damage to the barges, their cargoes, and the dam. Walker's Midstream Fuel and Service Company (hereinafter "Walker Midstream") owns the DARON and employed the crew which manned the vessel at the time of the accident. Bunge Corporation, Bunge Towing, Inc., and Marine Office of America Corporation (hereinafter called collectively "Bunge") are respectively the owner, charterer and insurer of the barges that were in the DARON's tow. R & W Marine, Inc. (hereinafter "R & W"), secured the services of the DARON for Bunge upon the latter's request for towage. The United States of America owns and operated Smithland Locks and Dam.

The action commenced with the filing of Walker Midstream's complaint for exoneration or limitation of liability pursuant to 46 U.S.C. §§ 181–195. In addition to limitation, Walker Midstream seeks indemnification from the United States and, accordingly, has tendered the United States to all claimants as a third-party defendant. Bunge answered Walker Midstream with a claim for damages to its barges and their cargoes, and also filed a third-party complaint against R & W. R & W responded by filing a claim for indemnification or contribution against Walker Midstream and a crossclaim against the United States. The United States filed a separate action against the DARON in rem and Walker Midstream in personam for violation of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 403, 408, 409. That action was subsequently consolidated with the action now before the court. The court has jurisdiction pursuant to 28 U.S.C. §§ 1333, 1345 and 46 U.S.C. § 740 et seq.; the claims of the parties are within the scope of Rule 9(h) of the Federal Rules of Civil Procedure.

By order of the court, the case was bifurcated for separate proceedings on the is-

sues of liability and damages. The liability portion of the case was tried before the court without a jury on August 22–29, 1983. The court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being otherwise sufficiently advised, hereby makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. Walker Midstream Fuel & Service Company was, at all times relevant to this action, a corporation duly organized and existing under law and was the owner and operator of the M/V ROBERT DARON, a river towboat, which it manned, maintained, victualed and supplied.

2. The M/V ROBERT DARON was, at all time relevant to this action, a steel hulled river towboat approximately 75 feet long, 22 feet wide, and 7½ feet deep. The vessel was powered by a single 149–15 Detroit diesel engine and was propelled by a single propeller with a diameter of 71 inches and a pitch of 54 inches. Although rated for 900 horsepower at 1800 RPMs, the DARON's engine could turn only 1750 RPMs and develop between 675 and 815 horsepower when pushing a tow.

3. Bunge Corporation and Bunge Towing Company, Inc., were, at all times relevant to this action, corporations duly organized and existing under law and were the owners and charterers of six steel-hulled river barges known as Bunge 72B, Bunge 205B, AD204B, Bunge 11, AD757, and Bunge 51. These barges, each measuring about 200 x 35 feet with draughts of 9 feet, comprised the tow of the DARON on March 3, 1981.

4. Marine Office of America Corporation, was, at all times relevant to this action, the underwriter for Bunge.

5. R & W Marine, Inc., was, at all times relevant to this action, a corporation duly organized and existing under law. Although R & W owned and operated several river towboats, it did not own or operate the DARON.

6. The United States of America is a sovereign and was, at all times relevant to this action through the Army Corps of Engineers, the operator of the Smithland Locks and Dam located at approximately Mile 918.5 on the right descending shore of the Ohio River.

7. The Smithland Locks consist of two lock chambers, each 1200 feet long and 110 feet wide, which parallel the Illinois bank of the river. The chamber closest to the shore is known as the land chamber. A guard wall separates the land chamber from the second lock which is known as the river chamber. The Smithland Dam consists of 11 tainter gates, each 110 feet wide, located directly riverward of the lock chambers. A fixed weir connects the dam with the Kentucky shore. This design—a center dam flanked by a pair of locks and a fixed weir—funnels the river's flow through the tainter gates in the center dam.

8. Extending upstream from the locks are three guard walls designed to assist tows in lining up for lockage. The longest guard wall (hereinafter "longwall"), approximately 1800 feet in length, is located immediately riverward of river chamber and separates the lock from the dam. A middle wall, approximately 600 feet in length, separates the river chamber from the land chamber. A short wall extends about 1500 feet upstream from the land side of the land chamber.

9. The Army Corps of Engineers began planning the Smithland Locks and Dam in the 1960s. The Corps' Nashville District was responsible for the initial design. Refinements of the design to ensure proper navigational conditions at the locks and dam were achieved by use of a scale model of the facility which was constructed at the Corps' Waterways Experiment Station (hereinafter "WES") located near Vicksburg, Mississippi. After studying the model, designers concluded that openings, or "ports", in the longwall would reduce the effects of outdraft on upstream ap-

proaches to the locks. Outdraft, which is also called "set", is the lateral current created when a river's flow is diverted around a stationary object. Outdraft tends to increase as current strengthens.

10. Although the final design of the Smithland Locks and Dam differed from the model constructed at WES—*e.g.*, the model contained 17 tainter gates, the dam only 11—the final design incorporated the recommendation calling for ports in the longwall. The completed wall contains 48 ports, each 20 feet wide and 12 feet high, spaced at 10 foot intervals with their bases at an elevation of 290 feet. The ports are designed to allow the river's current to flow through the lockwall, thereby reducing the outdraft which would exist were the entire flow diverted around the upstream end of the wall. Tests made at WES in 1967 showed that, once Smithland reached its intended pool level, optimal flow conditions would be obtained if all ports were open and that conditions would deteriorate as ports were closed.

11. In 1973, during construction of the Smithland facility, concrete closure panels were placed over 36 of the 48 ports in the longwall. Six ports were completely covered and 30 partially closed. As soon as the locks became operational in September 1979, a full year before completion of construction of the fixed weir, tows encountered outdraft. Outdraft was especially strong whenever the dam was running more than 150 feet of water; that is, when the openings of the 11 tainter gates totaled more than 150 feet.

12. In October and November of 1979, both the Louisville District office of the Corps of Engineers and the United States Coast Guard issued navigation notices warning of an outdraft above the longwall at Smithland Locks and Dam. The notices stated that the current had caused tows to break-up on the wall.

13. In February 1980, Wayne Kelly, the Smithland lockmaster, attended a meeting in Louisville Kentucky to discuss navigation problems at the locks and dam. At that meeting, the effect of the port closure

panels on outdraft above the lock was discussed at length. Later, in April 1980, the Corps' Louisville District office, which oversees the Smithland facility, requested WES to perform tests on the Smithland model using the port closure configuration described above in paragraph 11. The 1980 tests confirmed the findings made in the 1967 tests: the effectiveness of the locks' design for controlling outdraft deteriorates as ports are closed. The new tests also indicated that the ill effects of port closure would increase as the volume of water flowing through the dam increased.

14. With Completion of the fixed weir in September 1980, the port closure panels no longer served as an aid to construction at Smithland. By January 1, 1981, the dam had achieved a pool elevation of 320 feet above mean sea level, and on January 25 the dam achieved its intended pool of 324 feet. These elevations, coupled with the low volume of water running through the tainter gates at that time, presented ideal conditions for removal of the port closure panels. Nevertheless, the panels remained in place and outdrafts continued to occur.

15. In February 1981, the Ohio River began to rise. On February 22, when the tainter gates were open a total of 182 feet to accommodate the rising water level, lockmaster Wayne Kelly observed a considerable increase in outdraft above the longwall. On February 24, Kelly instructed his lockmen to begin warning downbound vessels that there was an outdraft and suggested that small vessels with heavy tows be assigned the land chamber when locking downstream.

16. On February 25, 1981, the lockmaster informed the engineering division at the Corps' district office in Louisville that the upriver outdraft had become serious. Two days later, after consulting with WES, the engineering division contacted the operations division and informed them of the problem. Engineering urged operations to take action on the longstanding recommendation that the closure panels be removed in order to improve the flow of the current through the lock and thereby reduce out-

draft. Operations, however, took no immediate action to correct the problem. When the Corps finally removed the panels late in November of 1981, the task required only four days· to complete.

17. On or about ·February 28, 1981, James M. Fultz, a barge dispatcher for Bunge, telephoned Ray Bledsoe, a boat dispatcher for R & W, to request movement of six barges from Mount Vernon, Indiana to Cairo, Illinois. Bledsoe told Fultz that "R & W would get the barges moved," and that he would call Fultz back when he knew "when and by whom."

18. Bledsoe first checked the availability of R & W's own boats. When he discovered that none of the company craft were available, he began looking for an outside boat. Paul Floyd, another boat dispatcher for R & W, assisted Bledsoe in his search for an outside boat and eventually secured the services of the DARON from Walker Midstream. Bledsoe then called Fultz and informed him that the M/V ROBERT DARON would tow Bunge's barges.

19. Bledsoe and Fultz did not discuss towage rates, for both understood that R & W would bill Bunge for towage in accordance with a published rate schedule. No follow-up letters or cables were exchanged by Bunge and R & W to document the terms of the booking or the responsibilities of the parties. However, in the event of problems or complaints about towage by the outside boat, Bledsoe expected Bunge to contact R & W, not Walker Midstream. Bledsoe's expectation was consistent with the course of dealing between Bunge and R & W: in booking towage, Bunge dealt solely with R & W and had no contact whatsoever with Walker Midstream.

20. On other occasions when R & W secured outside boats to move Bunge's barges, R & W, not the boat owners, billed Bunge. On all such occasions R & W's bills were for "towage", never "brokerage".

21. On or about March 1 1981, pursuant to its towage contract with R & W, Walker Midstream dispatched the DARON to pick up Bunge's barges. The vessel was manned by its usual crew consisting of two pilots, Jack Slagle and Hughie W. Scott, and two deckhands, Joe D. Egner and David Robinson.

22. Jack Slagle became a licensed river pilot in 1974 and began piloting boats for Walker Midstream in 1978. While at Walker Midstream, Slagle spent the majority of his time piloting the DARON on shuttle runs up and down the Tennessee and Ohio Rivers. Prior to March 1981, he had successfully piloted the vessel through the Smithland Locks on about a dozen occasions, including a run on January 26, 1981, on which he piloted a tow of six loaded barges downstream through the locks without mishap. On that occasion, with the dam running about 20 feet of water, the lockman told Slagle to expect a slight outdraft. The DARON encountered the outdraft as she moved along the longwall to enter the river chamber; however, she had no difficulty getting into the lock.

23. Hughie W. Scott began piloting boats for Walker Midstream in 1975.

24. Joe D. Egner and David Robinson were experienced deckhands who, prior to March 1981, had tended the DARON's tows through the Smithland Locks on numerous occasions.

25. On March 2, 1981, the DARON picked up three loaded grain barges at Newburgh, Indiana and another three at Mount Vernon, Indiana before heading for Cairo, Illinois. The crew arranged the tow in two files of three barges each with the files faced up to the vessel. The lead barge in the port file was a "box", that is, both its bow and stern were square. The bow of the lead barge in the starboard file was raked.

26. The DARON's tow was properly made up and, as stipulated by the parties, the barges were well secured. As further stipulated, Bunge's barges were free from fault and did not contribute to the accident.

27. On March 2, 1981, while the DARON was making up her tow in Indiana, the M/V CHEMICAL EXPRESS, a 2250 h.p. vessel pushing a tow of seven loaded· grain

barges, was attempting to lock upriver through the river chamber of the Smithland Locks. As soon as the vessel exited the chamber, the pilot encountered an outdraft. The outdraft increased as the vessel moved upriver and ultimately pinned the tow against the longwall. Despite numerous attempts using full power to push the tow off the wall, the CHEMICAL EXPRESS could not escape the outdraft. Eventually, with a lockman's assistance, the vessel backed into the river chamber, locked downriver, and then locked upriver through the land chamber. Upon exiting the land chamber, the vessel hugged the shore and escaped the outdraft.

28. Shortly after Midnight on March 3, 1981, the DARON reached Stewart's Island located approximately five miles upriver from the Smithland Locks and Dam. Upon arriving at the island, Captain Slagle radioed the lock to advise lockman Bill Schnake of his presence and of his intention to navigate downriver through the lock. The lockman informed Slagle that another vessel, the M/V A.N. PRENTICE, was using the lock and that he must therefore hold his position until called down. The lockman asked Slagle for the size of his tow and informed him that the dam was running 230 feet of water. In fact, the dam was running 275 feet of water, the greatest volume of water ever funneled through the dam to that time.

29. While waiting at Stewart's Island, Slagle contacted a Walker Midstream dispatcher to inform him of the DARON's estimated time of arrival in Paducah. Shortly after 2:00 A.M., Slagle radioed the Captain of the PRENTICE to inquire about conditions at the lock. The PRENTICE, a 5600 h.p. vessel pushing a tow of nine loaded coal barges and six empties, had just completed locking downstream through the river chamber when Slagle called. The Captain informed Slagle that there was some outdraft at the lock.

30. After the PRENTICE completed lockage, the lockman called the DARON down. The lockman instructed Slagle to use the land chamber and to "come down slow" staying close to the Illinois shore. Before proceeding downstream, Slagle inquired whether anyone was having trouble getting into the lock. The lockman said no. Although it is disputed whether the lockman informed Slagle about the outdraft, the record shows that he neither described the strength of the outdraft nor informed Slagle that, on the previous morning, the outdraft had pinned the upriver bound CHEMICAL EXPRESS against the longwall.

31. When the DARON came abreast of Old Maid's Light, a point on the Illinois shore about a mile above the longwall, Slagle reduced the vessel's headway to less than two miles an hour and the deckhands then went out on the tow to assist with lockage. One deckhand, stationed at the front of the tow, had a walkie-talkie. The other, stationed at the back of the tow, did not.

32. Slagle kept within 75 feet of the Illinois shore as he approached the locks. By "knuckling" the engine in and out of gear, he maintained the vessels speed at less than two miles an hour.

33. While still within 75 feet of the shore and about 250 feet above the longwall, an outdraft began to swing the bow of the tow to port. Slagle was able to bring the tow back in line with the lock by applying starboard rudder. However, at about 200 feet upriver of the longwall, a powerful outdraft began to push the entire tow away from the bank. Slagle came full ahead in an attempt to outrun the outdraft, but the DARON had insufficient power to accomplish this maneuver. When the front of the tow was within 50 feet of the head of the longwall, Slagle reversed engines in an attempt to kill his headway. He then radioed the lockman and instructed him to open the river chamber. Moments later, the lead port barge struck the head of the longwall. The tow broke up and the barges were swept around the longwall into the dam. Although the dam, the barges and their cargoes were damaged, sunk or lost, none of the DARON's crew suffered injury.

34. At trial, Walker Midstream and Bunge stipulated the fair market value of the DARON immediately after the casualty to be $300,000 and its pending freight to be $5,152.50, creating a limitation of liability fund of $305,152.50.

35. Based on the facts articulated above, the court finds that two circumstances contributed to the allision of the M/V ROBERT DARON with the longwall: 1) the *outdraft* above the locks which was augmented by closure of the ports in the longwall, and 2) the *inappropriate speed* at which the DARON approached the lock, which was due in part to the lockman's inadequate response to Slagle's inquiry and in part to Slagle's misapplication of the information before him. Because legal liability will be apportioned on the basis of the comparative fault of the parties, *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the court makes the following allocation of fault: 1) for its failure to remove the closure panels placed over the longwall ports, and for the lockman's inadequate response to Captain Slagle's inquiry about conditions at the lock, The Army Corps of Engineers bears 50% of the fault; and, 2) for Captain Slagle's error in approaching the lock too slowly under the circumstances known to him, Walker Midstream bears 50% of the fault. The legal significance of these findings of fact is discussed below.

### CONCLUSIONS OF LAW

1. *The M/V ROBERT DARON is liable for damage to the Smithland Locks and Dam, but not for obstructing navigation.*

■ The United States claims that the DARON and its owner, Walker Midstream, are liable under the Rivers and Harbors Act of 1899 (hereinafter "Act") for damage to the Smithland Locks and Dam and for sinking barges in a navigable channel and otherwise obstructing navigation on the Ohio River.

Section 14 of the Act, 33 U.S.C. § 408, makes it "unlawful for any person to ... alter, deface, destroy, move, injury ... or

in any manner whatever impair the usefulness of any work built by the United States for the preservation and improvement of any of its navigable waters or to prevent floods." Locks and dams are works of the type described in § 408. *See e.g., Hines, Inc. v. United States*, 551 F.2d 717 (6th Cir.1977). Consequently, the Smithland Locks and Dam are protected by the Act.

Section 15 of the Act, 33 U.S.C. § 409 (also called the Wreck Act), makes it unlawful "to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels ... in such manner as to obstruct, impede, or endanger navigation." *See Argi-Trans Corp. v. Gladders Barge Line, Inc.*, 721 F.2d 1005, 1010 (5th Cir.1983) (negligent sinking without obstruction of navigation does not constitute violation of Wreck Act).

Section 16 of the Act, 33 U.S.C. § 412, provides, in part, that any vessel used in a violation of § 408 or § 409 shall be liable for pecuniary penalties described in 33 U.S.C. § 411, "and in addition thereto for the amount of the damages done by" said vessel, and that said vessel "may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof."

Section 10 of the Act, 33 U.S.C. § 403, prohibits the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." Violations of § 403 are punishable by fines and imprisonment described in 33 U.S.C. § 406.

The allision of the DARON with the longwall and the consequent break-up of its tow caused damage to the Smithland Locks and Dam. Such damage constitutes a violation of § 408. In keeping with the combined purpose of § 408 and § 412, which is to provide funds for the repair and maintenance of government works damaged by vessels plying the nation's navigable waterways, it is well settled that liability under the Rivers and Harbors Act is not subject to limitation on the basis of the Limitation of Liability Act, 46 U.S.C. § 183(a). *Hines,*

551 F.2d at 728. Consequently, the damages assessed against the DARON for violation of § 408 will not be limited to the vessel's stipulated value.

For the past decade, there has been general agreement among the courts that § 408 imposes strict liability on vessels that cause damage to government works. *See e.g., Id.* at 724. Further, contributory negligence has not been a defense to liability under § 408 and, absent proof that the government was solely at fault, has not been a basis for apportioning or otherwise reducing damages. *United States v. Tug Colette Malloy,* 507 F.2d 1019, 1022 (5th Cir.1975). *See also United States v. Central Soya, Inc.,* 697 F.2d 165, 169 n. 4 (7th Cir.1982); *United States v. Logan & Craig Charter Service,* 676 F.2d 1216, 1219 (8th Cir.1982). However, in a recently reported § 408 case, *Chotin Transp., Inc. v. United States,* 784 F.2d 206 (6th Cir.1986), the Sixth Circuit Court of Appeals broke with precedent and ordered an apportioning of damages on the basis of comparative fault saying, "[w]e also believe that where the fault of the United States is such as to equal that of [the vessel], a result which as here makes the United States whole (or better than whole) is obviously unfair." *Id.* at 210 (footnote omitted); *see also Id.* at 211 n. 3. The court has found that the United States bears half the responsibility for the accident at Smithland. Consequently, although the DARON has violated § 418 and Walker Midstream is liable, without the benefit of limitation, for damages (and possibly penalties) to be assessed under § 412, Walker Midstream shall pay no more than 50% of the costs of repairing the locks and dam.

Although both § 409 and § 403 prohibit obstruction of navigable waterways, § 409 addresses actual, present obstructions while § 403 concerns "the potential or capacity to obstruct navigation currently or in the future." *Sierra Club v. Morton,* 400 F.Supp. 610, 629 (N.D.Cal.1975), *quoted in Bunge Corp. v. Agri-Trans Corp.,* 542 F.Supp. 961, 971 (N.D.Miss.1982), *modified* 721 F.2d 1005 (5th Cir.1983). A threshold question for establishing the DARON's or Walker Midstream's liability under either statute is whether navigation through or around the Smithland Locks and Dam was obstructed, impeded or endangered as a consequence of the accident.

The record before the court includes numerous depositions from marine surveyors describing the salvaging of the barges that made up the DARON's tow. From that testimony, it appears that several of the barges eventually sank, some above the dam and at least one below it. Although a sunken barge may constitute an obstruction to navigation within the meaning of § 403 or § 409, this court cannot find Walker Midstream liable for creating such obstructions absent evidence that the barges sank in a navigable channel and, in fact, constituted a present or potential impediment to navigation. Because the United States has not developed these essential factual issues on the record, the court finds that the government has not sustained its burden of proof under § 403 and § 409.

### 2. *The United States is not immune to liability.*

Walker Midstream has tendered the United States to all parties as a third-party defendant. The Suits in Admiralty Act authorizes suit against the United States in situations where, "if a private person or property are involved, a proceeding in admiralty could be maintained." 46 U.S.C. § 742. The discretionary functions exception to liability has been read into the Suits in Admiralty Act. *Gemp v. United States,* 684 F.2d 404, 408 (6th Cir.1982); *In Re Ohio River Disaster Litigation,* 579 F.Supp. 1273, 1277–79 (S.D.Ohio 1984). The exception, as articulated in the Federal Tort Claims Act, releases the United States from liability for claims:

> based upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis added). The United States argues that the Corps' failure to remove the closure panels from the longwall ports and the lockman's failure to inform Captain Slagle of problems at the lock were, at worst, abuses of discretionary functions for which the government is exempt from liability.

In *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the Supreme Court noted that "it is unnecessary—and indeed impossible—to define with precision every contour of the discretionary function exemption." *Id.* at 813, 104 S.Ct. at 2765. Despite this difficulty, the Court articulated two factors which may help in determining which governmental actions are not subject to suit.

> First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case ... Second, whatever else the discretionary exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.

*Id.* at 813–14, 104 S.Ct. at 2765. By way of explaining the rationale behind the discretionary functions exception and of describing the scope of the exception, the Court added that

> Congress wished to prevent judicial "second guessing" of *legislative and administrative decisions grounded in social, economic and political policy* through the medium of an action in tort.

*Id.* In *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), an early decision addressing the scope of the discretionary functions exception, the Court introduced the now familiar distinction between a "planning" and an "operational" decision (the former being an immune discretionary function, the latter subject to judicial review). This distinction will prove useful in evaluating Corps' decision to install closure panels on the longwall at Smithland.

The significance of the planning/operational distinction has been explained as follows:

> In a strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion. *The planning level notion refers to decisions involving questions of policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy.* [*Cf. Varig, supra*]. [Decisions] ... are on the planning level because of the necessity to evaluate policy factors when making those decisions.
>
> The operations level decision, on the other hand, involves decisions relating to the normal day-by-day operations of the government. *Decisions made at this level may involve the exercise of discretion but not the evaluation of policy factors.*

*Alabama Elec. Co-op, Inc. v. United States*, 769 F.2d 1523, 1528 (11th Cir.1985), *quoting Swanson v. United States*, 229 F.Supp. 217, 219–20 (N.D.Cal.1964) (emphasis as in *Alabama Elec.*, citations omitted); *cf. Downs v. United States*, 522 F.2d 990, 996 (6th Cir.1975), *accord Schindler v. United States*, 661 F.2d 552, 555 (6th Cir. 1981).

The decision to build the Smithland Locks and Dam was made by Congress after evaluation of the political, economic, and social effects of such a facility on the Ohio River. That decision was a "planning" decision and is not subject to judicial scrutiny. Although design decisions "inherently grounded in social, economic and political policy," may be immune, the Corps' design of the locks and dam arguably embodies decisions of the litigable "operational" type. *Alabama Elec.*, 769 F.2d at 1531. The court finds it unnecessary to enter the design debate, however, for the instant dispute concerns the construction and operation, not the design, of the Smithland facility.

In 1973, during construction of the Smithland facility, the Corps decided that closure panels should be placed over the longwall ports and that they should remain in place until the dam reached its pool. The decision did not reflect policy formulation on the basis of social, political or economic concerns, nor did it involve government regulation of the conduct of private individuals. *Varig*, 467 U.S. at 813–14, 104 S.Ct. at 2765. Rather, it was an operational decision made to help carry out Congress' decision to build the locks and dam. *See Canadian Transport Co. v. United States*, 663 F.2d 1081, 1087 (D.C.Cir.1980); *Reminga v. United States*, 631 F.2d 449, 456 (6th Cir.1980); *Seaboard Coast Line R.R. Co. v. United States*, 473 F.2d 714, 716 (5th Cir.1973). As such, the Corps' decision regarding the installation and removal of the closure panels is not protected by the discretionary functions exception and is therefore subject to judicial scrutiny. We now address the government's immunity for the actions of the lockman.

In *Chotin, supra,* the owners of a vessel which caused damage to a government owned and operated lock sought a reduction of their liability on the basis of contributory negligence. At trial, the district court found the government 50% at fault by virtue of the acts and omissions of its lockman. On appeal, the government, relying on *Varig, supra,* argued that it was entitled the benefits of the discretionary function exception. The Sixth Circuit Court of Appeals rejected the government's argument saying:

> As we see this case, it does not by any means represent "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.... Nor will requiring the United States to assume commensurate liability for damages to the ship and the lock gate, in our judgment, "seriously handicap efficient government operations." *Varig*, 104 S.Ct. at 2765.

*Id.* 784 F.2d at 211–12. As in *Chotin*, the government here claims that it is entitled to immunity from liability for the acts and omissions of its lockman. As did the Sixth Circuit, this court rejects the government's argument. Consequently, neither the Corps' decision to install closure panels, nor the lockman's actions on the night of the DARON's accident constitute discretionary functions. The United States, therefore, is not immune to liability for its role in the accident.

3. *The United States breached its duty to maintain and operate the Smithland Locks and Dam with due care.*

The United States constructed the Smithland Locks and Dam as an aid to navigation on the Ohio River. The government had no duty to provide such a navigational aid. However, after it exercised its discretion and constructed the locks and dam, it was obligated to exercise due care in their maintenance and operation and subjected itself to liability for negligent performance of those activities. *See Indian Towing Company v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 126–27, 100 L.Ed. 48 (1955). *See also, Drake Towing Co., Inc. v. Meisner Marine Const. Co.*, 765 F.2d 1060, 1064 (11th Cir.1985); *Butler v. United States*, 726 F.2d 1057, 1063 (5th Cir.1984); *Southern Natural Gas Co. v. Pontchartrain Mat.*, 711 F.2d 1251, 1254 (5th Cir.1983); *Neal v. Bergland*, 646 F.2d 1178, 1182 (6th Cir.1981); *Seaboard Coast Line R.R. Co. v. United States*, 473 F.2d 714, 716 (5th Cir.1973).

The Corps' failure to remove the longwall closure panels in a timely manner constituted a breach of the government's duty to maintain navigational aids with due care. The Corps installed the panels to prevent tows from catching on the longwall ports which were at or above waterlevel during construction of the dam. After construction was completed and the ports were safely submerged, the Corps intended to remove the panels, for WES studies and observations of navigational conditions at Smithland during construction had informed the Corps that the panels could have an adverse effect on navigation above the locks.

By January 1, 1981, shortly after completion of construction, conditions at the dam were ideal for removal of the panels. Conditions remained good for at least 25 days, affording the Corps ample opportunity to perform the four or five day task of removing the panels. Despite this opportunity, the panels remained in place for ten months and were in place on the night of the accident. Had the panels been removed in January, the risk of harm to the DARON would have been greatly reduced. The Corps' failure to remove the panels in a timely fashion constituted a breach of the government's duty to maintain the facility with due care. This breach was a contributing cause to the DARON's allision with the longwall in which Bunge's barges were damaged.

■ The lockman's failure to adequately respond to Captain Slagle's inquiry about conditions at the lock constituted a breach of the government's duty to operate navigational aids with due care. A lockman has a duty to advise river pilots accurately and completely of conditions at a lock. *Cf. Pierce v. United States,* 679 F.2d 617, 621 (6th Cir.1982). Proper performance of that duty is essential, for conditions at a lock are largely controlled by the Corps. Consequently, a pilot cannot rely solely on his river sense when navigating a lock. Rather, the law requires him to defer to the orders and directions of the lockman. 33 C.F.R. § 207.300(a). If those directions are inaccurate or incomplete, the pilot and his tow may be endangered.

On the night of the accident, the lockman informed Slagle that the dam was running 230 feet of water. A review of the Smithland log shows that this information was erroneous, for the dam was actually running at 275 feet. For reasons discussed *infra* in connection with Captain Slagle's negligence, the court does not believe this misinformation contributed to the accident. However, it is evidence of an absence of precision in the lockman's communications with the DARON.

The government alleges, and Slagle denies, that the lockman informed the DAR-ON about the outdraft at the locks. The court finds this dispute of little significance since Slagle was already aware of the outdraft at Smithland, having navigated through it only a month before the accident. Slagle's failure to appreciate the strength of the outdraft on the night of the accident, however, is due in part to the lockman's failure to adequately respond to the captain's inquiry.

Before coming down from Stewart's Island, Slagle asked the lockman whether anyone was having trouble getting into the lock. The lockman's answer was both inaccurate and incomplete—he answered, "no." Had he informed Slagle that on the previous morning an upbound 2250 h.p. vessel pushing but one more barge than the DARON had been pinned against the longwall, Slagle would have had a greater appreciation of the strength of the outdraft and may have viewed the lockman's instruction to "come down slow," in a different light. Instead, the lockman substituted his own judgment for that of an experienced river pilot on the apparent assumption that the difficulties of an upbound tow using the river chamber would be of no relevance for a downbound tow using the land chamber. By failing to inform Slagle of earlier difficulties, the lockman breached his duty to give accurate and complete information to river pilots. This breach constituted a breach of the government's duty to operate the locks with due care and was a contributing cause to the accident and subsequent damage.

For the Corps' breach of its duty to maintain and for the lockman's breach of his duty to operate the Smithland Locks and Dam with due care, and in accordance with the allocation of fault made at the conclusion to the Findings of Fact, the court finds that the United States is liable for 50% of the damage caused to Bunge's barges as a consequence of the DARON's allision with the longwall.

4. *Captain Slagle was negligent in approaching the lock too slowly.*

■ The parties are in agreement that the DARON could have escaped the out-

draft and evaded the longwall had Captain Slagle brought the vessel down at a greater speed. Walker Midstream argues that the lockman bears sole responsibility for the DARON's speed, for it was he who instructed Slagle to "come down slow." Assuming Slagle was under an obligation to follow the letter of the lockman's directions, the instruction "come down slow" was too inexact for the court to conclude that Slagle's obedience put the tow in danger. Rather, the court must consider the reasonableness of Slagle's response to the lockman's vague counsel.

It is well settled that no firm rule can be laid down as to the appropriate speed for a vessel in every situation, for circumstance determines proper speed. *See, e.g., McCready v. Goldsmith,* 59 U.S. 89, 18 How. 89, 15 L.Ed. 288 (1856). Even the sportsman paddling his canoe learns this as he encounters changing currents on familiar streams. Thus, an instruction to "come down slow" does not call for a surrender of navigational judgment on a pilot's part, and "If he tests the danger of increased current at a place where his common sense and nature's physical laws would tell that a crosscurrent would embarrass his progress, he does so at his own risk." *Utility Service Corp. v. Hillman Transportation Co.,* 244 F.2d 121, 124 (3rd Cir. 1957). A review of the record convinces that court that, on the night of the accident, Slagle had sufficient information and knowledge to realize that his approach to the lock was too slow.

Before beginning his approach, Slagle inquired about trouble at the lock. As discussed above, the lockman failed to honor his duty to give complete and accurate information to Slagle and for that breach the United States shares responsibility for the accident. Although the lockman failed to inform Slagle about the trouble encountered by the CHEMICAL EXPRESS, he did inform the captain that the dam was running 230 feet of water, many times the flow the DARON had encountered on its prior passage through the lock with six loaded barges on January 26, 1981. At his deposition, Slagle made the following statements regarding his conversation with the lockman on the night of the accident:

... I asked if they had been having any trouble. He said, "No, just stay about 75 feet off the bank and to come slow."

Q. Did you ask him whether there was a set there at the time?

A. No.

Q. Did you know that there was going to be a set there?

A. I figured there was going to be.

Q. What did he tell you about the river conditions?

A. He told me there was 230 feet of gate openings.

Q. Which means there were more gate openings than there had been on January 26, 1981?

A. Right.

Q. What did that information tell you?

A. They just told me that there was going to be a set there.

Q. All right, you knew that there was 230 feet of gate openings on March 3, as compared to 180 feet of gate openings on January 26, 1981. Right?

A. Right. [At trial, Slagle admitted that the 180 foot figure used at his deposition was due to an error in recollection, and that on January 26, 1981, the lockman had informed him that the dam was running only 26 feet of water. The Smithland Log show the dam running at from 18 to 22 feet on that date.]

Q. Did that give you any indication as to the strength of the set you would encounter?

A. No.

Q. Did that suggest anything to you?

A. No.

Q. It never occurred to you that that information would affect the manner in which you should approach the lock?

A. No.

Deposition, 11/10/82, pp 43–44. While Slagle's deposition testimony reveals a failure to consider the navigational consequences of increased flow on the night of the accident, his trial testimony demonstrates an

understanding of the hydrodynamic effects of increased flow.

Q. Okay, so now you believe when you were coming down on the day of the accident that the gates were at approximately 230?

A. Right.

Q. And approximately five weeks before you had come through and learned that the gates had been 26?

A. Yes.

Q. And under conditions where the gates were 26 you learned there was a small set?

A. Yes sir.

Q. So did you expect more set when the gates were at 230?

A. I expected it would be a little strong.

Q. Okay, let's look at that. Isn't it true that when there is higher flow in the river the outdraft is stronger?

A. I know the current is stronger.

Q. Does that include outdraft?

A. At some locks, I guess.

Q. Smithland?

A. Naturally.

Q. Naturally?

A. Yeah, I found that out.

Q. So higher flow gives you stronger outdraft, right?

A. Right.

Q. And you knew that before the accident at Smithland?

A. Yes sir.

Transcript, pp 946–47. Thus, on the night of the accident, Slagle knew an outdraft existed at Smithland, was told that the dam was running 230 feet of water (at least eight times the flow he remembered encountering there only five weeks before), and understood the hydrodynamic effect of the increased flow on the strength of the outdraft. Despite this knowledge, Slagle came down unreasonably slow—an error in judgment constituting negligent navigation.

5. *Walker Midstream exercised due diligence in providing a competent pilot and is entitled to limitation for Slagle's negligence.*

 Bunge argues that in manning the DARON, Walker Midstream breached its duty to provide a competent pilot, thereby rendering the vessel unseaworthy. To be seaworthy, a vessel and its crew must be fit to meet the perils reasonably to be anticipated on a particular voyage. *Walker v. Harris,* 335 F.2d 185, 191 (5th Cir. 1964). A pilot unfit to protect a vessel from foreseeable perils is an incompetent pilot for whose negligence the shipowner is not entitled to limitation of liability. A competent pilot, however, may make errors without rendering a vessel unseaworthy or imperiling limitation if the owner lacks privity or knowledge of the pilot's negligent acts. *See Signal Oil & Gas Co. v. Barge W–701,* 654 F.2d 1164, 1170 (5th Cir.1981); *Matter of Texaco, Inc.,* 570 F.Supp. 1272, 1278–79 (E.D.La.1983). The court believes Walker Midstream exercised due diligence in providing a pilot for the DARON and that Slagle was competent even though he acted negligently in approaching the lock too slowly, an error beyond the privity or knowledge of Walker Midstream.

The record before the court shows Slagle to be an able pilot duly licensed who, prior to March 3, 1981, had ample experience locking tows through Smithland and other locks under varying conditions. Bunge cites several cases to support its contention that although Slagle may have proved competent to pilot six loaded barges through Smithland when the dam was running only 26 feet of water, that experience did not establish his competence to perform the task when the dam was running 230 feet. *See Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151 (2d Cir.1978), *United States of America v. Pittston Marine Transport Corp.,* 1978 A.M.C. 1786 (2d Cir. 1978); *The Framlington Court,* 69 F.2d 300 (5th Cir.1934); *In re Canal Barge Company,* 323 F.Supp. 805 (D.C.Miss. 1971). These cases concern the appointment of inexperienced masters who encoun-

tered dangers which were known to, and therefore could have been avoided by, more experienced mariners. They are inapposite to the novel situation presently before the court in which an experienced pilot encountered an unprecedented outdraft due to a record flow through the newly completed dam. If only pilots who have successfully navigated through known dangers are competent, no pilot was competent to navigate the DARON (or any other vessel for that matter) through the untested conditions and unknown dangers at Smithland on the night of the accident. The river transportation industry depends upon the experience, skill and judgment of boatmen to move freight through the changing media of wind, water and current. To presume that an experienced pilot is incompetent to navigate through novel river conditions unreasonably devalues the very expertise on which the river industry must rely. In view of the novel situation existing at Smithland, Walker Midstream exercised due care by selecting Slagle, a seasoned pilot who was familiar with the locks.

In furtherance of its characterization of Slagle as incompetent, Bunge argues that the dispatchers at Walker Midstream were unqualified to select a competent pilot. The court finds this contention meritless, for it can find nothing (save Slagle's inexperience in locking through Smithland during record flows, a requirement no pilot could satisfy) which would have apprised a qualified dispatcher of Slagle's alleged unfitness for service. Again, consider the information available to Walker Midstream's dispatchers on March 1, 1981, when they instructed Slagle to move Bunge's barges. First, almost sixteen months had passed since the Corps had issued a notice to navigation interests concerning the potentially hazardous outdraft above the Smithland Locks. The two notices addressing that hazard, issued in October and November of 1979, had been duly distributed to Walker Midstream's pilots and read by Slagle. Second, the Corps had issued notices in March and April of 1980 stating that a helper boat would be made available at Smithland "to facilitate naviga-

tion during construction." The notice explained that the boat would be withdrawn when the elevation of the upper pool reached 315 feet and rising, thereby suggesting that navigational conditions would improve upon completion of the dam. Third, when Walker Midstream dispatched the DARON, no notice of the revival of the hazardous outdraft at Smithland had been issued to navigation interests on the Ohio even though the Smithland lockmaster had informed the Corps of the danger a week before the accident. Finally, Slagle had a good record, was familiar with the DARON, and knew the Smithland locks. He was aware of the existence of an outdraft at Smithland by virtue of his own prior experience, the navigation notices, and informal discussions at Walker Midstream. He had an appreciation of hydrodynamics and the possible correlation between increased flow and the strength of an outdraft, and he had a habit of inquiring about trouble before negotiating a lock. Given this set of circumstances, the court cannot agree that Walker Midstream failed to exercise due diligence in selecting a pilot for the DARON. When, in the face of unprecedented and untested navigational conditions, an experienced pilot makes an error which, in the exercise of greater care, might have been avoided but, given the pilot's good record, knowledge and experience, could not have been foreseen, the pilot's negligence does not establish a lack of due diligence in the selection of a competent crew. The court will not bootstrap Slagle's negligence into a breach of warranty of seaworthiness. *Signal Oil,* 654 F.2d at 1170.

Under the Limitation Act, 46 U.S.C. § 183, the liability of a shipowner for any loss, damage, or injury "done, occasioned, or incurred" without its privity or knowledge may not exceed the value of its interest in the vessel. Walker Midstream's interest in the DARON has been stipulated to be $305,152.50. To determine whether Walker Midstream may limit its liability to the stipulated sum, the court must initially determine what acts of negligence or condi-

tions of unseaworthiness caused the allision and then determine whether Walker Midstream had privity or knowledge of such acts or conditions. *Verrett v. McDonough Marine Service,* 705 F.2d 1437, 1444 (5th Cir.1983). The court has completed the initial step by finding that Slagle's negligence was one of the causes of the DARON's allision with the longwall. As to the second—whether the shipowner had privity or knowledge, a determination which turns on the facts of each individual case, *In re Valley Line Co.,* 564 F.Supp. 612, 616 (E.D. Mo.1983), *citing Coryell v. Phipps,* 317 U.S. 406, 411, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943)—the court has determined that Walker Midstream exercised due diligence in selecting Slagle to pilot the DARON and six loaded grain barges through the Smithland Locks and Dam under the conditions that existed on March 3, 1981. Walker Midstream had no reason to anticipate and therefore no privity or knowledge of Slagle's error. Consequently, the court finds that Slagle's miscalculation of the proper speed for approaching the lock does not affect Walker Midstream's right to limit its liability. *Mac Towing Inc. v. American Com'l Lines,* 670 F.2d 543, 548 (5th Cir. 1982); *Petition of Bloomfield Steamship Company,* 422 F.2d 728, 735–36 (2d Cir. 1970); *In re Valley Line Co.,* 564 F.Supp. at 616.

Walker Midstream's liability for Slagle's navigational negligence shall not exceed $305,152.50.

### 6. *The DARON was seaworthy.*

■ Bunge claims that the DARON was underpowered and therefore unseaworthy. The standard for seaworthiness "is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). Thus, a vessel competently manned and properly equipped is seaworthy if it has sufficient power to meet the reasonably anticipated navigational hazards of its intended voyage. *Walker,* 335 F.2d at 191. The outdraft at Smithland, which was especially strong when the dam was running high volumes of water, was such a hazard and Walker Midstream had a duty to provide a vessel that could handle it.

All agree that had Captain Slagle approached the lock at a greater speed—a maneuver for which the vessel was adequately powered—the tow might have overcome the outdraft. Thus, if navigated with due care, the DARON may have proved sufficiently powered to navigate its tow through the lock under the conditions present on the night of the accident and, therefore, may have proved seaworthy. *PPG Industries, Inc. v. Ashland Oil Co.-Thomas Petroleum,* 592 F.2d 138, 146 (3rd Cir.1978), *cert. denied Canal Barge Co., Inc. v. PPG Industries, Inc.,* 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979). Once its tow was in trouble, however, the DARON's power proved inadequate to prevent the allision.

Having exercised due diligence in appointing a competent pilot to navigate the DARON, Walker Midstream cannot be charged with privity or knowledge of Slagle's negligence, nor could it have reasonably anticipated the resultant struggle for which the DARON proved underpowered. Thus, assuming the DARON had sufficient power to make the lock if nevigated with due care, Walker Midstream did not breach its duty to provide for reasonably anticipated perils. A vessel sufficiently powered to handle reasonably anticipated hazards is not rendered unseaworthy because it fails to escape a peril encountered solely because of the negligent act of a competent pilot. To hold otherwise would raise the standard for seaworthiness from "reasonable fitness" to "perfection."

Because the DARON's power was tested only after Slagle's negligence put tug and tow in peril, we cannot say with certainty that the vessel would have proved equal to the outdraft had it been navigated properly; and although the parties agree that Slagle erred in approaching the lock too

slowly and further agree that the vessel would have escaped the peril had Slagle brought it down at a greater speed, greater speed alone may not have overcome the record outdraft which existed above the locks on the night of the accident. Bunge has searched the Smithland Logs and discovered that four other boats locked through Smithland with tows of six loaded barges during the record flows. The smallest of those vessels had 1030 h.p. This data, argues Bunge, suggests that the DARON, which produced less than 900 h.p. (perhaps as little as 675), was insufficiently powered for its intended voyage. The testimony heard from Leonard Schlamp, a navigational expert called by Bunge, supports this assertion.

Q. Captain, do you have an opinion as to the sufficiency of the motor vessel ROBERT DARON assuming she had 900 horsepower to handle a six load barge tow with a box out on the port lead barge under the river conditions that existed at Smithland? Do you have an opinion on that point?

A. Yes sir.

Q. Tell us your opinion, Captain.

A. I believe the boat was overloaded.

Q. Why do you say the boat was overloaded?

A. I just feel like it's just too much weight and drag for that horsepower to get out of a bad situation once you get into it, but if you get in a bad situation, I am not saying you are going to get into a bad situation everytime you move the tow with that size boat, but if you do, you don't have any recourse to get out of it ...

Q. What margin of error if any was granted to the Pilot of the DARON to get out of a tight spot or correct a slight navigational error in a boat loaded like that, Captain?

A. Very little. He had to be right. Transcript, pp. 1406–07. Captain Edgar Allen Poe, a navigational expert called by Walker Midstream, agreed that the margin of error was slim, but for all boats, not just small ones.

... I don't really know that horsepower had anything to do with what caused the casualty.

Q. Why is that?

A. The man [Slagle] came in there dead slow, knuckled in and got in this outdraft. He came down there, knuckled in going dead slow at a mile and a half an hour. He could've done that with a big outboard motor. That's what got him in trouble. *Once he was in trouble, horsepower would not have gotten him out of trouble ...*

Q. Well with an 1800 horsepower [towboat] going full ahead with more thrust and more power why couldn't it have pushed out of that outdraft?

A. An 1800 horsepower boat, number one, will not rev up as fast as a 900 horsepower boat with this type of engine ... Towboats aren't dragsters. They don't pick up speed that fast. There is no boat on the river that would overcome the current that was swift and strong enough to sweep six barges around the wall and over the dam.

Transcript, pp. 1023–24 (emphasis added).

The experts' disagreement over whether additional horsepower would have saved the DARON is of little interest to the court, for Walker Midstream had no duty to provide a vessel capable of escaping unanticipated perils encountered through unforeseeable pilot error. Of some interest, however, is Captain Schlamp's suggestion that the DARON afforded Slagle no margin of error. The novel navigational conditions at Smithland made it imperative that Walker Midstream dispatch a vessel with sufficient power to afford its pilot some margin of error in navigating through the untested, unprecedented currents above the locks. However, because Slagle's error in approaching the lock too slowly was too profound to be remedied by a last minute correction, Walker Midstream's failure to afford Slagle a sufficient margin of error—if, indeed, the DARON could be rendered unseaworthy on this basis—would not deprive it of limitation under 46 U.S.C. § 183, for the DAR-

ON's alleged incapacity to execute minor corrective maneuvers was not a cause of the accident. *See Verrett,* 705 F.2d at 1444.

The DARON's inability to escape the outdraft was only a condition, not a cause, of the accident at Smithland. *Cf. Great Lakes D. & D. Co. v. Metropolitan S. & G. Corp.,* 82 F.Supp. 595, 600–01 (E.D.N.Y. 1949). Consequently, Walker Midstream's liability for damage to Bunge's barges is based solely on Slagle's negligent navigation and is limited to the stipulated value of the vessel and its pending freight.

7. *R & W Marine is liable, with Walker Midstream, for Slagle's negligent navigation.*

 On February 28, 1981, Bunge contacted R & W and requested a ride for its ill-fated barges. R & W, in turn, contacted Walker Midstream and engaged the DARON for the job. R & W characterizes its role in finding the DARON as that of a marine broker bringing two principals— Bunge and Walker Midstream—together in a contract for towage. Bunge, on the other hand, portrays R & W as a fellow principal who designated Walker Midstream as its agent for performing the contract. If a principal, R & W is liable for the negligent performance of the towage contract by its agent, Walker Midstream. If a broker, R & W is not liable, for a marine broker's exposure to liability ends upon providing a competent tug and crew selected through the exercise of reasonable care. *Todd Shipyards Corp. v. Moran Towing & Transportation Co.,* 247 F.2d 626, 627–28 (2d Cir.1957).

Few cases address the controlling differences between a marine brokers and a contract principal; none address the subject in depth. *See, e.g., Todd Shipyards, supra; Rice v. The MARION A.C. MESECK,* 148 F.2d 522 (2d Cir.1945); *George W. Rogers Construction Corp. v. Tug OCEAN KING,* 252 F.Supp. 657 (S.D.N.Y.1965); *Gulf Wave Towing Co. v. Mitchell,* 176 F.Supp. 636 (E.D.La.1959); *The BRILLIANT,* 64 F.Supp. 612 (E.D.Pa.1945); *The*

*PRIDE,* 41 F.Supp. 326 (E.D.N.Y.1941); *The JUNGSHOVED,* 272 F. 122 (D.C.N.Y. 1921). Of these, *Todd Shipyards* is both the most authoritative and the most analogous to the instant case and, consequently, the most persuasive to the court.

In *Todd Shipyards,* Todd used a chartered scow for storing steel girders as they were removed from another vessel. While dismantling the vessel's spar decking, Todd contacted Moran Towing and requested a tug for moving the receiving scow into a new position. Moran's dispatcher informed Todd that he had no tugs available but agreed to find an outside boat. The dispatcher then contacted Sound and Harbor, Inc. (S & H), found a tug, and directed the S & H dispatcher to order the tug to report to Todd. Todd knew the tug was not Moran's vessel.

In the course of moving the scow, the S & H tug damaged the vessel's deckhouse. Todd notified Moran that it was making a claim against it for damage to the scow; meanwhile, S & H billed Moran for the tug's services and Moran billed Todd for the same at its higher, standard rate.

At trial, Moran argued that it was a broker and, therefore, not liable for the tug's negligent performance of S & H's contract with Todd. The district court rejected this argument and found that Todd and Moran had dealt as principals. *Todd Shipyards Corp. v. Moran Towing & Transport,* 140 F.Supp. 107, 110 (E.D.N.Y. 1956). On appeal, the Second Circuit affirmed noting four factors in support of the lower court's ruling: 1) Moran, not Todd, had ordered S & H to dispatch the tug; 2) the billing procedure used by Moran suggested a contract for towage; 3) Moran paid S & H for use of the tow without regard to Todd; 4) there were no direct communications between Todd and S & H about the hire of the latter's tug. *Todd Shipyards,* 247 F.2d at 628.

Bunge, R & W and Walker Midstream played the same roles and bear the same legal relationships to one another as did Todd, Moran and H & S respectively. First, just as Moran ordered S & H in *Todd*

*Shipyards,* R & W ordered Walker Midstream to dispatch the DARON to pick up Bunge's barges. Second, a review of R & W's billing procedures shows that it always billed Bunge for the full cost of towage at a standard rate, never for brokerage fees. (R & W argues that this is the standard billing procedure for brokerage services on the Ohio. If so, brokerage and towing agreements cannot be distinguished on the basis of billing and the court must look to other factors to determine the nature of the relationship between Bunge and R & W.) Third, if, as on earlier occasions, the DARON had completed the voyage without mishap, Walker Midstream's fee would be due from R & W regardless of R & W's arrangements with Bunge. Finally, the DARON was engaged without any direct communications between Bunge and Walker Midstream. The fit of these facts with the factors articulated in *Todd Shipyards* persuades the court that Bunge and R & W were fellow principals and that Walker Midstream was R & W's agent or subcontractor for performing the principals' towage contract.

R & W tenders several arguments to distinguish *Todd Shipyards* from the instant case. First, R & W argues that the *Todd Shipyards* courts found Moran to be in control of the operations of the tug dispatched to do the requested task. In its published opinion, the district court quotes a phrase from the testimony of one Grandone, a dispatcher for Moran, in which he states that he "ordered a tug" to report to Todd to move the scow. 140 F.Supp. at 110. On appeal, the Second Circuit condensed the phrase to a single word: "Grandone testified that he 'ordered' [the tug] to report to Todd." 247 F.2d at 628. If these statements constitute a finding of control over the tug, then R & W's control over the DARON equalled, if not exceeded, Moran's control over S & H's tug. A close reading of the *Todd Shipyards* opinions shows that Grandone's "orders" were given to S & H's dispatcher, not the tug itself. Just so, R & W explained the Bunge job to Walker Midstream personnel who, in turn, dispatched the DARON.

A second question over which both Bunge and R & W labor is whether Bunge knew R & W had secured an outside boat. Whatever the answer, such knowledge did not enable Moran to shed its duties as a contract principal and don the light cares of a broker, nor will it shield R & W from the negligent acts of Walker Midstream.

Finally, R & W has combed the record for instances of Bunge's alleged assent to R & W's role as marine broker. Even Bunge's litigation strategy, says R & W—Bunge sued Walker Midstream before suing R & W—proclaims a broker-client relationship. The court has reviewed the evidence, but finds neither express nor circumstantial support for R & W's claim of a meeting of minds on the establishment of R & W as Bunge's agent for the procurement of towboats rather than its principal for the performance of towage contracts. Accordingly, The court finds that R & W was not a broker and is therefore liable for the negligent performance of the towage contract by its agent, Walker Midstream.

Captain Slagle's negligence accounts for *50%* of the damage to Bunge's barges for which both R & W and Walker Midstream are liable. *Todd Shipyards,* 247 F.2d at 628; *Rice,* 148 F.2d at 523. For reasons stated earlier in this opinion, Walker Midstream, as owner of the DARON, is entitled to limitation of its damages. R & W, however, has no statutory right to limitation and is liable for the balance of Bunge's damages. R & W may, however, have a right to indemnification which the parties may address during the damages portion of the instant case. Accordingly, subject to possible indemnification by Walker Midstream, R & W is liable for *50%* of Bunge's damages less the stipulated amount of the limitation fund.

### SUMMARY OF FINDINGS ON LIABILITY

1. Walker Midstream is liable for 50% of the costs of repairing the Smithland Locks and Dam, but is not liable for obstructing navigation at that facility.

2. The United States is liable for 50% of Bunge's damages.

3. R & W and Walker Midstream are liable for 50% of Bunge's damages; however, Walker Midstream is entitled to limitation of its liability to the stipulated sum of $305,152.50, and R & W is liable for the balance, subject to possible indemnification.